UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| RICHARD BEYER and MONICA BEYER,<br>      *Plaintiffs*,<br>            *v.*<br>ANCHOR INSULATION CO., INC., JOHNS MANVILLE, INC., and ICYNENE CORPORATION,<br>      *Defendants*. | Civil No. 3:13cv1576 (JBA)<br><br>October 28, 2014 |

**RULING ON MOTIONS TO DISMISS**

Defendants Anchor Insulation Co., Inc. ("Anchor"), Johns Manville, Inc., and Icynene Corporation move [Doc. ## 46, 49, 51] for partial dismissal of Plaintiffs' Second Amended Complaint, asserting claims under the Connecticut Products Liability Act ("CPLA") and the Connecticut Unfair Trade Practices Act ("CUTPA"). For the reasons that follow, Anchor's and Icynene's Motions are granted as to the CUTPA counts and Johns Manville's Motion is granted as to the CUTPA count and denied as to the CPLA counts.

**I.     Facts Alleged**

Plaintiffs Richard and Monica Beyer allege that on September 27, 2010, they contracted Anchor to install spray polyurethane foam ("SPF") insulation, which is used as an alternative to traditional fiberglass insulation, in the attic, basement and undercarriage of their home in Niantic, Connecticut. (2d Am. Compl. [Doc. # 44] ¶ 7.) Defendants Johns Manville and Icynene manufactured the insulation foam sprays that were used in Plaintiffs' home with Johns Manville's used in the basement and undercarriage of the home and Icynene's used in the attic. (*Id.* ¶ 13.) In October 2010, shortly after installation, Plaintiffs noticed that the insulation was emitting noxious and harmful,

fumes, gases and odors, and caused them to suffer from severe headaches, burning of the skin and eyes, heart palpitations and/or irregular heartbeats, and difficulty breathing.  (*Id.* ¶¶ 15–16.)  Mr. Beyer's preexisting asthma was exacerbated.  (*Id.* ¶ 16.)

In November 2010, Plaintiffs noticed that the insulation foam materials were starting to shrink and separate from the surfaces to which they were attached and environmental testing revealed that the Johns Manville and Icynene products were both defective in that they emitted toxic gasses and chemicals into their home.  (*Id.* ¶¶ 17, 20–21.)  Plaintiffs then hired Anchor to remove the insulation products from their home, which resulted in further contamination as dust and fumes permeated the home, and Anchor failed to completely remove all of the insulation.[1]  (*Id.* ¶ 22.)

---

[1] Plaintiffs assert claims against Anchor for negligence (Count One), breach of warranty (Count Two) and for Connecticut Products Liability Act ("CPLA")—product defect (Count Three), CPLA—failure to warn (Count Four), and Connecticut Unfair Trade Practices Act ("CUTPA") (Count Five); against Johns Manville for CPLA—product defect (Count Six), CPLA—failure to warn (Count Seven), and CUTPA (Count Eight); and against Icynene for CPLA—product defect (Count Nine), CPLA—failure to warn (Count Ten), and CUTPA (Count Eleven).  The original complaint [Doc. # 1-1] was filed in state court and removed [Doc. # 1] to federal court by Defendants.  Jurisdiction is proper based on diversity of citizenship.

## II. Discussion

All three Defendants move to dismiss the CUTPA claims (Counts Five, Eight, and Eleven); Defendant Johns Manville also moves to dismiss Counts Six and Seven, the CPLA claims.[2]

### A. CUTPA Claims (Counts Five, Eight, and Eleven)

Defendants move to dismiss the CUTPA claims in the Second Amended Complaint on the grounds that they are barred by the CPLA's exclusivity provision and the statute of limitations. Because the Court concludes that Plaintiffs' claims are time-barred, it will only address Defendants' preclusion arguments as they relate to the statute of limitations, that is, because the original complaint failed to allege any valid CUTPA

---

[2] Anchor originally moved to dismiss Counts One and Two for negligence and breach of warranty on the basis that the CPLA was the exclusive remedy for these products liability claims. However, upon Plaintiffs' representation that these claims are "subsumed within the CPLA" and were pled separately simply "for organizational purposes" (Pls.' Opp'n [Doc. # 56-1] at 6), Anchor has withdrawn its motion to dismiss Counts One and Two (*see* Anchor's Reply [Doc. # 59] at 2). However, Johns Manville maintains that Count Seven, which it characterizes as a "claim for negligent failure to warn" should be dismissed because it is derivative of Plaintiffs' CPLA claim in Count Six. (Johns Manville's Mem. Supp. [Doc. # 50] at 21.) Icynene likewise argues that the two CPLA counts against it (Counts Nine and Ten) should be "subsumed into one unified CPLA count." (Icynene's Mem. Supp. [Doc. # 52] at 19.) However, unlike Counts One and Two that do not reference the CPLA, Counts Six and Seven against Johns Manville are both claims under the CPLA and Count Seven makes no reference to a theory of negligence. Although a plaintiff bringing a cause of action under the CPLA "retains the right to allege traditional theories of recovery," including failure to warn and strict liability, these claims should be brought "under one unified CPLA claim." *Fraser v. Wyeth, Inc.*, 857 F. Supp. 2d 244, 252 (D. Conn. 2012). However, where a plaintiff fails to do so, rather than dismissing the claims and barring a theory of recovery, "the Court will instead read the [separate] counts of the Complaint to constitute a single CPLA claim broken up into individual common law theories of products liability." *Id.*

claims that were not precluded by the CPLA, the CUTPA claims in the Second Amended Complaint, which were filed outside of the limitations period, do not relate back and are necessarily time-barred even if they allege other valid CUTPA claims.

The CPLA provides that claims asserted under the Act "shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product." Conn. Gen. Stat. § 52-572n(a). "The exclusivity provision makes the product liability act the exclusive means by which a party may secure a remedy for an injury caused by a defective product." *Gerrity v. R.J. Reynolds Tobacco Co.*, 263 Conn. 120, 126 (2003). A products liability claim under the CPLA "includes all claims or actions brought for personal injury, death or property damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of any product." Conn. Gen. Stat. § 52-572m (b).

The Connecticut Supreme Court has explained that the CPLA was intended to codify the common law of product liability but "was not designed to eliminate claims that previously were understood to be outside the traditional scope of a claim for liability based on a defective product." *Gerrity*, 263 Conn. at 128. Thus, "the language of the exclusivity provision makes clear that the product liability act was intended to serve as the exclusive remedy for a party who seeks recompense for those injuries caused by a product defect," but "it was not designed to serve as a bar to additional claims, including one brought under CUTPA, . . . for an injury not caused by the defective product." *Id.*

In *Gerrity*, the plaintiff brought suit against cigarette manufacturers alleging under the CPLA that the defendants' products were defective and unreasonably

4

dangerous because they were addictive and caused lung cancer. 263 Conn. at 123. The plaintiff also asserted claims under CUTPA alleging that "the defendants engaged in an industry-wide scheme to defraud consumers into believing that there was a bona fide scientific dispute regarding the addictive nature of cigarettes and the health hazards associated with them" and in furtherance of this scheme "the defendants issued false public statements, failed to disclose evidence of the addictive nature of cigarettes, increased the nicotine levels in cigarettes, neutralized warnings of smoking related health hazards, and targeted minors in advertising their products." *Id.* at 123–24.

The Connecticut Supreme Court held that the exclusivity provision of the CPLA only precluded CUTPA claims that were "nothing more than a product liability act claim dressed in the robes of CUTPA" but did not apply to the plaintiff's CUTPA claims which sought "to redress merely a *financial injury* suffered by the decedent, of a kind that has never been regarded as part of the traditional tort remedy for harm caused by a defective product." *Id.* at 129–130 (emphasis in original). The CUTPA claims survived because they alleged "that the decedent was forced to pay a higher price for the defendants' cigarettes than she would have had to pay in the absence of the wrongful course of conduct allegedly engaged in by the defendants," which is distinct from a claim for personal injury, death or property damage that is the exclusive province of the CPLA. *Id.* at 130–131.

Thus, while CUTPA is generally a broad remedial statute, in the products liability context, *Gerrity* circumscribes the scope of a CUTPA claim and requires plaintiffs to distinctly allege that any injuries claimed under CUTPA are separate "financial injuries" rather than harm caused by a defective product. *See Town of Sprague v. Mapei Corp.*, No.

5

3:11CV890 (WWE), 2012 WL 1900120, at *2 (D. Conn. May 24, 2012) ("In determining whether a [CUTPA claim] falls within the scope of the CPLA, the Court should examine the nature of the injury alleged and the alleged act that caused the harm."). Whether or not Plaintiffs have met this pleading burden in the Second Amended Complaint need not be decided because they have failed to do so in their original complaint and thus to the extent that the Second Amended Complaint alleges any valid CUTPA claims under *Gerrity*, they are time-barred.

The statute of limitations for a CUTPA claim is three years. *See* Conn. Gen. Stat. § 42-110g(f) ("An action under this section may not be brought more than three years after the occurrence of a violation of this chapter."). Plaintiffs' original Complaint [Doc. # 1-1] was filed on September 26, 2013, one day prior to the expiration of the statute of limitations measured from the date when Plaintiffs contracted with Anchor for the installation. The Second Amended Complaint was filed outside of the limitations period and thus these CUTPA claims are time-barred unless they relate back to the original complaint.

Fed. R. Civ. P. 15(c)(1)(B) provides that "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or

defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."[3]

"The purpose of Rule 15 is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities. For a newly added action to relate back, the basic claim must have arisen out of the conduct set forth in the original pleading. Under Rule 15, the central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading. Where the amended complaint does not allege a new claim but renders prior allegations more definite and precise, relation back occurs." *Slayton v. Am. Exp. Co.*, 460 F.3d 215, 228 (2d Cir. 2006) (internal quotation marks, citations and alterations omitted).

Although Plaintiffs' original complaint asserted nominal claims under CUTPA, the CUTPA claims asserted in the Second Amended Complaint address separate conduct and thus would not relate back to the original complaint. The original CUTPA claim as to Anchor is based on the same conduct that underlies the products liability counts, alleging product liability due to the insulation foam emitting noxious fumes because

---

[3] A federal court sitting in diversity should apply the relation back doctrine of federal law where there is a conflict between state and federal law. However, there is no conflict between Connecticut and federal relation back doctrine, *see Vigilant Ins. Co. v. Servco Oil, Inc.*, No. 3:09-CV-829 (JCH), 2010 WL 2710479, at *4 n.4 (D. Conn. July 7, 2010) ("[E]ven if Connecticut law were to apply, the Connecticut Supreme Court has 'recognized that [the state] relation back doctrine is akin to rule 15(c) of the Federal Rules of Civil Procedure' and that the underlying policy justification of the doctrine is the same as in federal law—'namely, ensuring that parties receive fair notice.'" (quoting *Sherman v. Ronco,* 294 Conn. 548, 556–57 (2010)), and thus the same analysis would govern under Connecticut law.

Anchor "improperly mixed products" sold by Johns Manville and Icynene when Plaintiffs agreed to buy only Johns Manville's product. (1st Compl. Count One ¶¶ 6, 13.) The CUTPA claim expressly incorporated the allegations in the products liability count and asserted that "Defendant Anchor engaged in deceptive trade practices, in violation of [CUTPA]," because it represented that it would only install the Johns Manville product but "actually installed different" insulation products. As a result, "Plaintiffs have suffered ascertainable loss of money and/or property." (*Id.* Count Three ¶¶ 16–19.)

As to Johns Manville and Icynene, the products liability counts of the original complaint alleged that their products were "defective" and "unreasonably dangerous" and as a result "caused the injuries set forth above, suffered by Plaintiffs" (*id.* Count Five ¶¶ 15–16, Count Eight ¶ 15–16) and that both companies breached their duties to warn Plaintiffs "about risks and hazards associated with" the products (*id.* Count Seven ¶¶ 14–15, Count Ten ¶¶ 17–18). The CUTPA counts as to these two defendants allege that they "engaged in deceptive trade practices in violation of [CUTPA]" because they "represented that their [products] were safe for residential use," "failed to disclose risks and hazards associated with their" products, and such products "were installed in Plaintiffs' home and caused the harm set forth above." (*Id.* Count Six ¶¶ 14–17, Count Nine ¶¶ 18–21.)

As Plaintiffs conceded at oral argument, the CUTPA claims in the original complaint do not allege any specific financial injury that is not caused by the defective product but instead claim only damage caused by the defective product and a failure to

warn.[4]  Thus, the original CUTPA claims would be barred by the CPLA's exclusivity provisions under *Gerrity*.

The Second Amended Complaint partially cures this pleading deficiency by tracking the language of *Gerrity* and alleging that there was a "purposeful failure [by Anchor] to disclose the risks and hazards associated" with installation and that Anchor "unfairly and deceptively maintained the price of its installation services at an inflated level and caused consumers to generally pay more for SPF installation than they would have otherwise paid absent" Anchor's "misrepresentations" that the insulation products were "a better alternative to traditional insulation products" and that Anchor's "employees were qualified to install" the products.  (2d Am. Compl. Count Five ¶¶ 46–50.)  Johns Manville and Icynene are alleged to have deliberately misrepresented that their spray insulation products were "safe for residential use," which allowed the companies to "unfairly and deceptively maintain[] the price" of their products "at an

---

[4] Plaintiffs maintained that the original complaint's failure to allege a distinct financial injury did not bar the claim under *Gerrity*, because the original complaint alleged misrepresentations by Defendants.  However, the alleged misrepresentations were that the products were safe and Defendants failed to advise Plaintiffs of the risks associated with them.  (*See* 1st Compl. Count Three ¶¶ 16–19, Count Seven ¶¶ 14–15, Count Ten ¶¶ 17–18.)  Such claims are not distinct from CPLA claims for failure to warn and warranty and thus are not valid CUTPA claims.  *See Gerrity*, 263 Conn. at 126; *see also Provost-Daar v. Merz N. Am., Inc.*, CV136037872S, 2014 WL 1193481, at *5 (Conn. Super. Ct. Feb. 24, 2014) ("Unlike the plaintiff in *Gerrity,* who alleged that she suffered a financial injury that was separate from her personal injuries due to the defendants' deliberate misrepresentations about the health hazards and addictive nature of cigarettes . . . , the plaintiffs in this case have not sufficiently alleged any specific actions on the part of the defendant that . . . caused [the plaintiff] a financial injury that is separate and distinct from her personal injury.").

inflated level and caused consumers to generally pay more." (*Id.* Count Seven ¶ 67, Count Eleven ¶ 86.)

Relying on *Gerrity*, Plaintiffs contend that their CUTPA claims in the Second Amended Complaint are not precluded by the CPLA because they have asserted a financial injury that is distinct from their claims for personal injury, death, or property damage under the CPLA, i.e., that "Defendants unfairly and deceptively maintained the price of their products at an inflated level causing Plaintiffs to pay more . . . than they would otherwise have paid in the absence of those misrepresentations" that their insulation products were superior to traditional insulation products and were safe for residential use. (Pls.' Opp'n [Doc. # 56-1] at 12–13; *see also* 1st Compl. Count Six ¶ 16, Count Nine ¶ 20.)

However, in asserting that Plaintiffs have alleged CUTPA claims in the Second Amended Complaint that are distinct from their CPLA claims, they necessarily have injected new facts and theories into the Second Amended Complaint, because the CUTPA claims in the original complaint did not allege a distinct financial injury even in conclusory fashion and thus would not provide notice of Plaintiffs' new theory of inflated prices. Thus, the Second Amended Complaint contains allegations based on separate

conduct rather than rendering prior allegations "more definite and precise."[5] *Slayton*, 460 F.3d at 228.

Defending against the two grounds for dismissal of the CUTPA claims presents Plaintiffs with a Hobson's choice: if they are correct that the Second Amended Complaint alleges valid CUTPA claims under *Gerrity*, such claims are either refinements of precluded CUTPA claims in the original complaint, which alleged no financial injury resulting from unfair business practices apart from the selling and manufacturing of defective products; or they are new, separate claims which may be non-precluded but as such would not relate back to the original complaint and thus are time-barred. Accordingly, Defendants' motions are granted as to the CUTPA claims.

### B. CPLA Claims Against Johns Manville (Counts Six and Seven)

Johns Manville is the only Defendant that moves to dismiss the CPLA claims against it, contending that these claims fail because Plaintiffs do not allege that "the product was expected to and did reach the consumer without substantial change in condition," a required element of a strict-liability claim. *Metro. Prop. & Cas. Ins. Co. v.*

---

[5] By contrast in *Gurliacci v. Mayer*, 218 Conn. 531 (1991), cited by Plaintiffs, the plaintiff asserted a claim for negligence resulting from a car accident, and outside of the limitations period, amended the complaint to add allegations that the defendant had acted willfully, wantonly and maliciously at the time of the accident because he was intoxicated. 218 Conn at 546–48. The Connecticut Supreme Court held that the amendment related back, because the amendment was not "dramatic" and "did not inject two different sets of circumstances and depend on different facts" or require the defendant "to gather different facts, evidence and witnesses to defend the amended claim . . . . but rather amplified and expanded upon the previous allegations by setting forth alternate theories of liability." *Id.* at 549. Here, the evidence required to defend a product defect claim and a claim of inflated prices based on consumer misrepresentations would be drastically different.

*Deere & Co.*, 302 Conn. 123, 131 (2011). Johns Manville contends that the basis for Plaintiffs' claim is that Anchor was negligent because it improperly mixed the foam insulation products of two different companies, John Manville and Icynene. (Johns Manville's Mem. Supp. at 24.)

The Second Amended Complaint explains that all foam insulation products "are formed when two liquids . . . referred to as an 'A side' and a 'B Side'[] come together at the tip of a spray gun" and "combine to form an expanding foam," which is sprayed into spaces where insulation is needed, and alleges that Anchor was negligent in its installation for "[i]mproperly mixing SPF Product(s) and/or components(s) during the installation." (2d Am. Compl. ¶¶ 8, 31a.)

Plaintiffs' original complaint alleged two different ways in which Anchor was negligent: "[It] improperly mixed products and/or A-side and B-side components, including SPF products manufactured, sold, and distributed by Defendant Johns Manville, Inc., and Defendant Icynene Corporation." (1st Compl. ¶ 13.) Thus, Plaintiffs' originally advanced two separate improper mixing theories: (1) that Anchor wrongfully combined the products of Johns Manville and Icynene and (2) that Anchor improperly combined the A-side and B-side components of one or both of these single products.

The Second Amended Complaint refers alternatively to the improper mixing of "Product(s) and/or component(s)." However, unlike the original complaint, which explicitly alleged that the Johns Manville and Icynene products were improperly combined, the Second Amended Complaint does not do so and instead alleges that each product was used in separate parts of Plaintiffs' home: Johns Manville in the basement and undercarriage and Icynene in the attic. (2d Am. Compl. ¶ 13.) Johns Manville

assumes that the Second Amended Complaint continues to allege that Anchor improperly mixed two separate products (*see* Johns Manville's Reply [Doc. # 57] at 9), but this theory is not explicitly alleged in the Second Amended Complaint. Rather, it only explicitly alleges that Anchor improperly combined the components required to assemble each individual product.

Plaintiffs' theory that Anchor improperly combined the A-side and B-side of Johns Manville's product is not necessarily inconsistent with Johns Manville being potentially liable for a product defect. While a manufacturer is generally not liable in strict liability for a product defect if its product was altered or modified by a third party, this limitation does not apply if: "(1) The alteration or modification was in accordance with the instructions or specifications of the product seller; (2) the alteration or modification was made with the consent of the product seller; or (3) the alteration or modification was the result of conduct that reasonably should have been anticipated by the product seller." Conn. Gen. Stat. § 52-572p(a).

Plaintiffs maintain that this provision applies, because the Second Amended Complaint alleges that Johns Manville sold its defective product "as a two-component system to Defendant Anchor for application," and that Anchor and Johns Manville represented that Anchor was an "'Approved Installer[]' and/or 'Factory Trained Installer[].'" (2d Am. Compl. ¶ 13, Count Six ¶ 57.) Thus, Plaintiffs contend, they have properly alleged that Johns Manville sold a single product that was delivered to Anchor as two component parts with a "recipe" or instructions that required Anchor to combine these components according to Johns Manville's instructions. (Pls.' Opp'n at 8.)

As Johns Manville noted at oral argument, if after a factual record is developed, the evidence shows that Anchor improperly installed or prepared the Johns Manville product, a defense could be based on Anchor's alteration or modification. However, this is speculation and presents a question of fact that cannot be resolved on a motion to dismiss as Plaintiffs have plausibly alleged that Anchor's preparation of Johns Manville's product was an alteration or modification in accordance with the manufacturer's instructions or was at least a reasonably foreseeable result. *See* Conn. Gen. Stat. § 52-572p(a).

Accordingly, Johns Manville's motion to dismiss Counts Six and Seven is denied.

### III. Conclusion

For the reasons set forth above, Anchor's Motion [Doc. # 46] to Dismiss Count Five and Icynene's Motion [Doc. # 51] to Dismiss Count Eleven are GRANTED and Johns Manville's Motion [Doc. # 49] to Dismiss is GRANTED as to Count Eight and DENIED as to Counts Six and Seven.

IT IS SO ORDERED.

    /s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 28th day of October, 2014.