## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| RICHARD BEYER and<br>MONICA BEYER,<br><br>_Plaintiffs_,<br><br>v.<br><br>ANCHOR INSULATION CO., INC.,<br>JOHNS MANVILLE, INC.,<br>JOHNS MANVILLE, INC. D/B/A<br>JOHNS MANVILLE INSULATION<br>SYSTEMS and ICYNENE CORPORATION<br><br>_Defendants_. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No.<br>     3:13-cv-01576-JBA |

## MEMORANDUM IN SUPPORT OF DEFENDANTS'
## MOTION TO EXCLUDE EXPERT TESTIMONY

Defendants Johns Manville, Inc. and Johns Manville, Inc. d/b/a Johns Manville Insulation Systems, Anchor Insulation Co., Inc. and Icynene Corporation (hereinafter, collectively "Defendants") submit this memorandum of law in support of Defendants' motion to exclude at trial expert testimony from Dr. Yuh-Chin Tony Huang.  As set forth below, any opinions offered by Dr. Huang on the subjects of general or specific causation would not rest on a reliable foundation and should be excluded from trial.  Specifically, Dr. Huang's conclusion -- ███████

████████████████████████████████████████████████████████████████

███████ – consists of little more than a theory that because ████████ arose after the installation of spray polyurethane foam insulation ████████████, they must have been "associated" with the spray foam.  This Court should demand more from a supposed expert and

**ORAL ARGUMENT REQUESTED**
**TESTIMONY NOT REQUIRED**

because he has nothing more to offer, Dr. Huang's opinions should be excluded from trial of this matter.

## I.     BACKGROUND

For purposes of this motion only, Defendants assume the truth of the underlying, background facts set forth in Dr. Huang's expert report, dated June 22, 2015.[1]  Those facts -- relied on by Dr. Huang for purposes of his report -- include:

- The Plaintiffs lived in a two-story, single-family home and, in September, 2010 decided to install spray polyurethane foam ("SPF") insulation in that home.

- The Plaintiffs hired the Defendant, Anchor Insulation, which installed the SPF between September 28, 2010 and October 19, 2010, with gaps in between the actual application.  According to the Plaintiffs, Anchor Insulation repeatedly ran out of the SPF product and had to return on other dates with additional material.

- The Plaintiffs were present in their home at various times during the installation.  Mr. Beyer reported to Dr. Huang that he was in the same room and often within 10 feet of the installer during multiple occasions when the SPF was being sprayed.

- The Plaintiffs noticed a change in the air quality in their home immediately after the SPF was installed and, specifically, a strong odor coming from the foam.

- 

- ▮▮▮▮▮▮▮▮▮▮▮▮ the Plaintiffs continued living in their home following the installation of the SPF and its subsequent removal.

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as of the date of Dr. Huang's June 2015 report.

(Dr. Huang Report, 6/22/2015 ("Huang Report") at 2)[2]

---

[1] Dr. Huang's factual rendition is based solely on information presented to him by the Plaintiffs several years after ▮▮▮▮▮▮▮▮▮▮▮▮.  And while Dr. Huang chose not to verify the truth of what the Plaintiffs told him, he assumed the truth of the Plaintiffs' assertions for purposes of his report.  (Deposition Transcript, 6/30/2016 ("Depo" at 288/18-25) The Defendants will, as necessary, dispute at trial much of what the Plaintiffs reported to Dr. Huang.

[2] Attached in support of Defendants' Motion are the following Exhibits: Exhibit 1 is a copy of Dr. Huang's Report dated June 22, 2015; Exhibit 2 is a copy of Dr. Huang's 2014 study

ME1 23318944v.1

## II.     DR. HUANG'S CONCLUSIONS AND METHODOLOGY

Dr. Huang, a pulmonologist, anticipates providing opinions on three issues in this case. First, his belief that the ███████████████████████████ and the medical treatment given necessary (sic) as a result of exposure to SPF chemical compounds . . . ." (Huang Report at 3)  Second, his conclusion that ███████████████████ are consistent with and most likely related to ███████████ to the SPF chemical compounds which were emitted in their home while they were present during the installation and thereafter . . . ." (*Id.*)  Finally, he wishes to offer opinions regarding "the likelihood of chemical sensitivities related to the [Plaintiffs'] exposures . . . ." (*Id.*)

Prior to rendering his June 22, 2015 report, Dr. Huang had neither examined nor spoken to either of the Plaintiffs.  Instead, his report relies on ████████████████████ provided to him by the Plaintiffs.[3]  (Depo at 55/11-57/22; 94/11-20)  ████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████ (Huang Report at 2)  Dr. Huang claims in his report that ██████ ████████████████ with "exposure chemical off-gassing from SPF insulation."  (Huang Report at 2)  He qualified his opinion, however, by noting twice that his report is not "final" and

(discussed below); Exhibit 3 are the cited pages from Dr. Huang's deposition taken on June 30, 2015; and Exhibit 4 are copies of unreported decisions.

[3] Dr. Huang's Report lists eleven categories of documents that he reviewed for purposes of his report.  (Huang Report at 2)  Those categories include medical records, air testing results, Dr. Huang's research, and discovery responses provided by the Plaintiffs.  (*Id.*)  As made clear during his deposition, Dr. Huang relied, for the most part on information provided to him directly by the Plaintiffs, along with his own prior research.  (Depo at 55/11-57/22; 63/2-5; 59/24-60/2; 171/5-8; 283/2-4)

is, instead, subject to further revision based upon his review of all testimony and documents. (Huang Report at 1 & 4)

Perhaps because he is a pulmonologist and not a toxicologist (Depo at 321/2-4; 404/21; 425/20-22), Dr. Huang's report never states that any injuries suffered by the Plaintiffs were "caused" by their exposure to SPF or to off-gassing from SPF.  Nor does his report ever identify any specific chemicals or dosages of chemicals that purportedly caused ███████████████  Instead, Dr. Huang repeatedly states only that ████████████████████████ are "consistent" with exposure to chemicals introduced into their home during installation of the SPF.[4]  (Huang Report at 2 & 3)  Relying solely on his own research (Depo at 95/13-15; 173/10-24), Dr. Huang does conclude that off-gassing of chemicals from SPF is "known to cause symptoms of multiple organ systems, including respiratory, neuropsychiatric, skin and GI."[5] (Huang Report at 3)  In the end, however, Dr. Huang's conclusions are not based on any theory of causation and are, instead, based on ████████████████████████████ ████████████████████  (Huang Report at 3)

This flawed methodology is consistent with the flawed methodology that Dr. Huang employed and the flawed conclusions he reached in the self-authored study on which he relies to arrive at his conclusions in this case.  That study – *Health effects associated with faulty application of spray polyurethane foam in residential homes*, Environmental Research 134 (2014) 295-300 ("Huang Study") – is no more conclusive on the issue of causation than was Dr.

---

[4] At various points in his report, Dr. Huang states that the ████████████████ 1) "consistent with exposure" (Huang Report at 2); 2) "consistent with and most likely related to ████████████ (Huang Report at 3); and 3) "consistent with the known adverse health effects reported by manufacturers of the SPF products."  (Huang Report at 3)

[5] As set forth below, in Section IV.A., the research on which Dr. Huang relies for his opinions in this matter is fundamentally unreliable on the issues involved in this case and should be excluded along with Dr. Huang's conclusions in regard to the Plaintiffs.

ME1 23318944v.1

Huang's report in this case.  For example, the Huang Study concluded only that "[f]aulty application of SPF was *associated with* acute and persistent pulmonary and extrapulmonary symptoms.  These symptoms may be *associated with* SPF-derived compounds as well as increased concentrations of indoor VOCs."  (Huang Study at 295 (Abstract) (emphasis added)) Similarly, in its penultimate paragraph, the Huang Study notes that "[i]n this study, we described 13 subjects who developed health complaints after their homes were retrofitted with SPF." (Huang Study at 300)  The ultimate conclusion of Dr. Huang and his co-author was, however, that "[t]he health effects were *likely associated with* the faulty application of SPF, *although the exact causes for these symptoms remain unclear*."[6]  (*Id.* (emphasis added))

As discussed below, the standard applied in Dr. Huang's 2014 study and in his 2015 report is flawed and does not rest on a reliable foundation.  Therefore, his opinions should be excluded.

## III.    LEGAL STANDARD GOVERNING MOTIONS TO EXCLUDE EXPERT TESTIMONY

This Court has explained and applied the legal standard governing motions such as this in at least three previously reported decisions:  *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 629 F. Supp. 2d 175 (D. Conn. 2009) (precluding testimony of environmental chemist on issue of causation in CERCLA action); *Rieger v. Orlor, Inc.*, 427 F. Supp. 2d 99 (D. Conn. 2006) (precluding expert testimony that would invade the province of the jury); and *Discepolo v. Gorgone*, 399 F. Supp. 2d 123 (D. Conn. 2005) (allowing psychiatrist's expert testimony that alleged victim of childhood sexual abuse suffered from post-traumatic stress disorder).

---

[6] Faulty application of SPF forms the underlying basis of Dr. Huang's opinion in this case. Indeed, his study twice notes that "[w]hen SPF is completely cured, it is considered inert and safe."  (Huang Study at 298 & 295 ("When SPF is correctly applied and cured, it is usually considered to be relatively inert . . . ."); Depo at 427/12-15)

ME1 23318944v.1

As explained by this Court in its prior rulings, the discretion of this Court to admit expert testimony is governed principally by Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702; *Innis Arden*, 629 F. Supp. 2d at 187-88; *Nimely v. New York,* 414 F.3d 381, 395 (2d Cir. 2005).

In its prior rulings on this subject, this Court properly looked first to the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), in which the Court "made clear that Rule 702 charges district courts with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Innis Arden*, 629 F. Supp. 2d at 188 (quoting *Daubert*, 509 U.S. at 597).

In determining whether an expert's reasoning and methodology are reliable, this Court may consider a number of factors, including: "(1) whether the theory or technique on which the expert relies 'can be (and has been) tested'; (2) whether the expert's methodology 'has been subjected to peer review and publication'; (3) the 'known or potential rate of error' of the technique when applied; (4) 'the existence and maintenance of standards controlling the technique's operation'; and (5) whether the theory or technique has been generally accepted in the scientific community." *Innis Arden* 629 F. Supp. 2d at 188 (quoting *Daubert,* 509 U.S. at 593–94).

Thus, the test of reliability is flexible and depends on the "nature of the issue, the expert's particular expertise, and the subject of his testimony . . . ." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (no single factor is determinative).  Instead, "the trial judge must have

considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.*, 526 U.S. at 152. Thus, the factors identified in *Daubert* need only be considered "where they are reasonable measures of the reliability of expert testimony." *Id.*; *Innis Arden*, 629 F. Supp. 2d at 188.

Additional factors identified by commentators and other courts include:

- Whether the expert has adequately accounted for obvious alternative explanations.[7]

- Whether the expert's methods are testable and falsifiable.[8]

- Whether the expert's opinions were developed expressly for purposes of testifying.[9]

"More generally, '[t]he hallmark of this reliability prong is the scientific method, *i.e.,* the generation of testable hypotheses that are then subjected to the real world crucible of experimentation, falsification/validation, and replication.'" *Innis Arden*, 629 F. Supp. 2d at 188-89 (quoting *Caraker v. Sandoz Pharm. Corp.,* 188 F. Supp. 2d 1026, 1030 (N.D. Ill. 2001); *see also Bauer v. Bayer A.G.,* 564 F. Supp. 2d 365, 383 (M.D. Pa. 2008) (following *Caraker* and

---

[7] *Innis Arden*, 629 F. Supp. 2d at 188; *see* Fed. R. Evid. 702 advisory committee's note; *see also United States v. Diaz,* 300 F.3d 66, 76 (1st Cir. 2002) (affirming the admissibility of testimony where the experts "explained in detail the methods and principles they employed" and "articulated their bases for eliminating alternative explanations"); *Claar v. Burlington N. R.R. Co.,* 29 F.3d 499, 502 (9th Cir. 1994) (affirming district court's determination that expert opinions were unreliable for failure "to rule out other possible causes for the injuries plaintiffs complain of, even though [the experts] admitted that this step would be standard procedure before arriving at a diagnosis"); *In re Rezulin Prods. Liability Litigation.,* 369 F. Supp. 2d 398, 420 & n. 137 (S.D.N.Y. 2005) (noting that courts consider "whether the expert has accounted adequately for obvious alternative explanations"); *Casey v. Ohio Med. Prods.,* 877 F. Supp. 1380, 1385 (N.D. Cal. 1995) (finding "case reports" to be unreliable because, among other things, they "do not isolate and exclude potentially alternative causes").

[8] *Innis Arden*, 629 F. Supp. 2d at 188; *Daubert*, 509 U.S. at 593; *see Zaremba v. General Motors Corp.,* 360 F.3d 355, 359 (2d Cir. 2004) (affirming exclusion of expert's testimony based the fact that his method "has not been tested").

[9] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995); *Cloud v. Pfizer, Inc.*, 198 F. Supp. 2d 1118, 1129 (D. Ariz. 2001); *Haggerty v. Upjohn Company*, 950 F. Supp. 1160, 1162 (S.D. Fla. 1996).

finding that the challenged expert's opinion establishing causation "does not rest upon a reliable methodology"). In this regard, "conclusions and methodology are not entirely distinct from one another" and there is "nothing in either *Daubert* or the Federal Rules of Evidence [that] requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The Court's "basic gatekeeping obligation," then, is "to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire,* 526 U.S. at 147 (quoting *Daubert,* 509 U.S. at 589). Just as it is within the Court's discretion to exclude expert testimony on reliability grounds, the Court enjoys "the same kind of latitude in deciding *how* to test an expert's reliability." *Kumho Tire,* 526 U.S. at 152 . In the end, "the question before the trial court [is] specific, not general. The trial court [has] to decide whether [a] particular expert [has] sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *Kumho Tire*, 526 U.S. at 156 (internal quotation marks omitted); *see also* Fed. R. Evid. 403.

## IV.   DR. HUANG'S OPINIONS SHOULD BE EXCLUDED FROM TRIAL.

In order to prevail in this action, the Plaintiffs must prove both general and specific causation. *In re Rezulin Products Liability Litigation*, 441 F. Supp. 2d 567, 575 (S.D.N.Y. 2006) Thus, Plaintiffs must prevail on two fundamental questions. First, whether the SPF insulation products manufactured or installed by the Defendants are capable of causing a particular injury or condition in the general population. Second, whether those products or their installation specifically caused the injuries complained of by the Plaintiffs. *In re Rezulin Products Liability Litigation*, 369 F. Supp. 2d 398, 401-02 (S.D.N.Y. 2005). In addition, in the absence of evidence of general causation, evidence of specific causation is irrelevant. *In re Rezulin*, 441 F. Supp. 2d at 578 (citing *Ruggiero v. Warner-Lambert Company*, 424 F.3d 249, 252 n.1 (2d Cir. 2005)).

ME1 23318944v.1

Here, the opinions to be offered by Dr. Huang are not reliable on the issue of general causation. That being so, this Court need not address the issue of specific causation. Even if it does, however, Dr. Huang's opinions on specific causation are equally unreliable and should also be excluded from trial.

### A.      Dr. Huang's Opinions On General Causation Do Not Rest On A Reliable Foundation And Should, Therefore, Be Excluded.

Dr. Huang's opinions on general causation rest solely on a study that he co-authored in 2014, which appears to have been motivated at least in part to meet Dr. Huang's litigation obligations as an expert witness. In fact, Dr. Huang admitted that he is not aware of any other study that supports the assertions that he makes in this case or in his 2014 study.[10]  (Depo at 346/7-12)  Since publishing it, he has never been contacted by any other scientists or doctors regarding his 2014 study.  (Depo at 416/14-16)  This is likely because his study is inherently flawed and clearly fails to meet the standards for a study into medical causation or toxicology by an expert in his or her field.  And because Dr. Huang relies entirely on this study to conclude that a faulty SPF installation is the likely "cause" of the ███████████████████, his opinion must be excluded because it is unreliable and lacks foundation.

Dr. Huang's study stands alone in its conclusions and, moreover, does not purport to be conclusive on the issue of whether symptoms exhibited by its 13 subjects were even caused by (as opposed to associated with) the "faulty" installation of SPF.  Of the 13 subjects in Dr. Huang's 2014 study, all reported "smelling unpleasant odors during the spray or when they returned within 48 [hours] after the spray was completed."  (Huang Study at 296)  Eleven of the

---

[10] Dr. Huang freely admitted that his own study was the only one he knows of that associates SPF with the complaints voiced by his subjects.  (Depo at 21/15-20; 356/7-13)  Yet he has never done any testing on SPF, nor has he done any experiments to replicate the potential exposures of the 13 subjects of this study, nor has he inquired as to whether there is any testing going on anywhere in the country in regard to SPF.  (Depo at 263/15-22; 361/2-9)

9

subjects "developed acute watery and burning eyes, burning nose, sinus congestion, throat irritation, cough, dyspnea and chest tightness." (*Id.*)  The Huang study itself admits that these symptoms "were nonspecific and our subjects might be 'sensitized' by the media reports and our initial publication on this issue (Tsuang and Huang, 2012)." (Huang Study at 298)  Yet Dr. Huang dismissed this argument and concluded that the purported symptoms were likely associated with SPF. (*Id.*)  In doing so, Dr. Huang failed to apply general standards for toxicology or to discredit potential sources of bias in reaching his conclusion.

Likewise, the study is unreliable because it does not and cannot identify the chemicals or dosages associated with the purported symptoms and, instead, concludes only that the health effects are "likely associated with the faulty application of the SPF." (Huang Study at 299)  According to Dr. Huang, "I don't have the levels.  I have the timing." (Depo at 362/7-12)  This is because there was no control group involved in Dr. Huang's study – *i.e.* Dr. Huang failed to consider or examine *any* of the thousands of homeowners who live in homes with SPF and do not complain of any symptoms. (Depo at 361/2-9)  Moreover, Dr. Huang does not consider himself to be an expert in SPF (Depo at 36/24-37/1) and has never done any experiments to try to replicate the potential exposures that the 13 subjects of his study complained of. (Depo at 347/5-12)

Dr. Huang also admitted that he did not thoroughly investigate the symptoms and claims of his 13 subjects.  He does not know, for example, how many of the 13 subjects had provided him with medical records. (Depo at 253/20-23; 254/13-17)  He also testified that he only had air samples for "maybe" half of his subjects. (Depo at 255/21-24)  For the other half, he was of the opinion that "based on the symptoms and based on the – and then based on the – the summary

of – you know, of those air sampling tests available to me, it's an extrapolation that, oh yeah, this probably is the case."  (Depo at 255/25-256/7)

Thus, the Huang Study is forced to equivocate remarkably on what might be the cause of its subjects' symptoms.  For example, Dr. Huang expressly admits that:

- "It is unclear which chemicals may be responsible for the symptoms."  (Huang Study at 299)

- "Little is known about health effects associated with these compounds, and presumably all can cause airway and mucosa irritation when the concentration is high."  (*Id.*)

- "The mechanisms for the persistent symptoms were unclear."  (*Id.*)

- "The gastrointestinal symptoms may simply be the reaction to the unpleasant odors, although a neurochemical mechanism is also possible."  (*Id.*)

- "We cannot exclude other indoor air pollutants, such as carbon monoxide or biologic agents, however, because they were not measured."  (*Id.*)

- "Similar environmental assays in houses insulated with SPF where there were no complaints would have been helpful in determining the exact role of these aldehyde compounds, but those data were not available to us."  (Huang Study at 300)

- "The subjects in our study redeveloped symptoms upon reentry of the house where concentrations of VOCs should have been very low.  This clinical paradigm may resemble multiple chemical sensitivity syndrome, in which multiple symptoms occur with exposure to very low level of environmental chemicals . . . however, there is at present no medical consensus concerning the definition or nature of this disorder." (*Id.*)

Yet, despite (or perhaps because of) this stated uncertainty and inability to exclude other potential causes or pinpoint specific chemicals, Dr. Huang only reaches an ultimate conclusion that "[t]he health effects were likely associated with the faulty application of SPF, although the exact causes for these symptoms remain unclear."  (*Id.*)

Additionally, and apart from the issues with Dr. Huang's methodology and its lack of controls, it is evident that his study is inherently biased and may have been written, at least in part, to offer opinions for litigation.  Although Dr. Huang's study fails to properly disclose his

11

involvement in litigation, at the time he co-wrote it he was involved in SPF litigation, as an expert, for homeowners.  (Depo at 238/11-14)  Since then, Dr. Huang has continued to appear only on behalf of Plaintiffs in spray foam cases.  (Depo at 278/8-13)  In fact, he has never turned down a case referred to him by a Plaintiff's attorney and has never concluded that the symptoms complained of were related to something other than SPF.  (Depo at 280/1-9; 281/22-25)  He further admitted that since 2011 or 2012, he has been contacted by three different lawyers and has been involved in seven or eight cases.  (Depo at 40/6-23)  Thus, Dr. Huang's undisclosed involvement in litigation tends to show that the study is unreliable and that its conclusion may have been formed, at least in part, for purposes of current and future litigation.

Similarly, the fact that at least several of Dr. Huang's subjects were involved in or were contemplating initiating litigation at the time of their participation in the study also raises significant questions of bias and shows that the study is inherently unreliable.  Dr. Huang admitted that subjects of the 2014 study personally sought out Dr. Huang and, at least in some instances, had been in contact with and knew each other.  (Depo at 243/5-16)  Some of these subjects were also already involved in litigation at the time of their participation.  Still others began litigation at a later time.  (Depo at 248/15-20; 249/15-21)   Yet, notwithstanding the subjective nature of the symptoms relayed to Dr. Huang, he did not feel that it was important to ask any of the subjects if they were already involved in litigation.  (Depo at 250/20-251/-23)

All of these issues and admissions establish that on the issue of causation, Dr. Huang is unable to give an opinion with any degree of scientific or medical certainty as to which of the chemicals contained in SPF caused the health effects that the Plaintiffs are complaining of. (Depo at 357/1-358/14)  These flaws and limitations on the scope of Dr. Huang's study resulted in his conclusion that the symptoms complained of by his subjects were only "associated" with

the installation of SPF and not "caused" by that product.  Dr. Huang explained the difference during his deposition:

A.     These symptoms – whoever complained of these symptoms – under the circumstances you associate the symptoms with exposure.

Q.     Okay.  And that's strictly because they – your – their relation of symptoms after installation, so therefore, the cause is established?

A.     I did not say cause.  I said it's associated with exposure.

Q.     Okay.  Maybe I don't appreciate the difference.  What is associated with, as opposed to caused?

A.     Cause, you have to have an established causal relationship.  Association can be just happen right after during and after.  So from the time standpoint it is associated with exposure, but in order to make sure that this is a cause in medicine or in science you have to do a study.  For example, you put the subject in the chamber, give them this fume or spray or the foams, and they develop symptoms right there.  Now, that's the cause.  Causal relationship.

Q.     Okay.  And so – so are you saying then that that would need to be done with the Beyers to establish causation between their exposure to the SPF and their symptoms?

A.     No.

Q.     Why not?

A.     It's too risky.

Q.     So so far you've established only association, not causation; correct?

                                        * * * * *

A.     It has always been an association, but there's a temporal association.  That's the time, temporal association.

Q.     But not causation?

A.     Not causation.[11]

(Depo at 393/10-25—394/1-22)

_____

[11] Dr. Huang, after trying to backtrack from the foregoing (Depo at 395/7-24) admitted that there are no scientific studies that prove a causal link between the SPF chemicals and the ███████ ████████████████████ or, presumably, his other study subjects.  (Depo at 395/25-396/7)

13

In regard to general causation, the most that Dr. Huang would agree to is that because the symptoms complained of by his subjects followed in time the installation of SPF in their homes, those symptoms must have been "associated" with the installation.  In short, Dr. Huang has the timing but not the causation.  Indeed, even when given the chance to equate "association" with "causation," Dr. Huang equivocated and refused to make that leap.  Under these circumstances, his opinions on the subject of causation are unreliable and should be excluded.  *See In re: Rezulin Products Liability Litigation*, 2004 WL 2884327 at \*3-\*4 (S.D.N.Y. Dec. 10, 2004) (granting summary judgment where expert's opinion that Rezulin caused cirrhosis did not pass muster under *Daubert*).

In addition, any effort by Dr. Huang to nuance the differences between "consistent with," "associated with," and "caused by" will likely serve only to confuse and mislead, rather than enlighten the jury.  Thus, Rule 403 of the Federal Rules of Evidence provides an alternate basis upon which this Court should exclude Dr. Huang's opinions.

**B.    Dr. Huang's Opinions On Specific Causation Do Not Rest On A Reliable Foundation And Should, Therefore, Be Excluded.**

On the issue of specific causation, Dr. Huang's conclusions are no more reliable than his conclusions on general causation.  Once again, Dr. Huang's conclusion seems to be nothing more than that because ███████████████ followed in time the installation of SPF in their home, the former most have been "associated" with the latter.  There remains no satisfactory explanation of a causative connection between █████████████ and the SPF installed in their home.  On top of this, Dr. Huang made little or no effort to eliminate alternative sources as the cause of ██████████████

Dr. Huang admitted that he believes it is important to see the actual Plaintiffs prior to rendering an opinion because he wants to learn "how real this is."  (Depo at 45/6-11)

14

Understanding that the symptoms complained of in regard to SPF are very subjective,[12] Dr. Huang believes that "there's a way that you can tell, is it real or not?"  (Depo at 45/12-19)  By talking to persons such as the Plaintiffs, "you sort of get a sense of their background, their – their motives, their – you know, why they're doing this, you know, all sort[s] of things.  So it's sort of an overall assessment of how reliable this patient is."  (Depo at 45/25-46/4; 398/20-399/25)

Yet, Dr. Huang did not examine either of the Plaintiffs prior to rendering his report in this case.  Instead, he relied almost entirely on a single self-serving email from the Plaintiffs to reach his conclusions.[13]  (Depo at 55/11–57/22; 94/11-20)  Nor did Dr. Huang talk to ███████████ ███████████████  (Depo at 63/2-5)  His review of ███████████████ and the drafting of his Report took only "[o]ne to two hours."  (Depo at 59/24 – 60/2)  Thus, it is clear from the record that the opinions rendered in his Report were entirely based on information provided to him by the Plaintiffs' email and nothing else.  (Depo at 171/5-8)

In terms of ruling out other potential causes,[14] Dr. Huang revealed in his deposition the shallowness of his background investigation:

> Q.    You said you had a series of questions that you typically asked your patients about their – their history of exposure to the product.  Wouldn't it be important to find out whether they had experience with spray foam insulation, other than, for example, the products that they're currently complaining about?

*  *  *  *  *

---

[12] Dr. Huang testified that the only objective factor in his analysis is "the time sequence."  He admitted that there is nothing at all objective about the symptoms complained of by the Plaintiffs.  (Depo at 49/10-20)

[13] Apparently realizing the deficiency caused by failing to examine the Plaintiffs prior to issuing his report, Dr. Huang examined the Plaintiffs after the fact, in January 2016, and issued a "supplemental" report well after the expert disclosure deadline.  That report was ordered stricken by the Court.  (Dkt. No. 144)

[14] None of the "other causes" supposedly ruled out by Dr. Huang --  pets, pollen, workplace, and dust -- are mentioned in his report.  (Depo at 338/23-339/20; 351/11-16)

15

A.      Well, it really depends, because, you know, he – a person may have a previous experience when – but when there are no problems, then he won't mention it. I won't ask. So we're dealing with a situation where it's causing him problems. So usually I just focus on that. So – and there are a lot of previous things that if they don't mention, I usually don't ask.

Q.      Okay. Well, wouldn't it be important to ask in order to determine and rule out whether or not that their experience with the other spray foam insulation could be the root cause of their current problems?

* * * * *

A.      Well, in retrospect you can say that, but at the time – you've got to think about at the time when somebody was telling me that my problems started at this time point. So all I want to know is prior to that he was fine.

(Depo at 303/2-304/4)

Dr. Huang also failed to consider a number of alternative explanations for ███████ ███████ in reaching his conclusion. For example, it is undisputed that Mr. Beyer installed "Tiger Foam" spray insulation in the Plaintiffs' home prior to the SPF that is at issue in this lawsuit. When asked, Dr. Huang stated that he has never seen Tiger Foam, but understands that it is an SPF comprised of an A side and a B side (similar to the products at issue in this case) and also contains MDIs. (Depo at 108/22-109/9) Notwithstanding the similarities, Dr. Huang did not ask Mr. Beyer any questions about his use of Tiger Foam, including whether Mr. Beyer used any kind of protection when he used the Tiger Foam. (Depo at 109/10-16) And he has no opinion whether the Tiger Foam that still existed in the Plaintiffs' home was causing any issues with VOCs. (Depo at 112/7-12)

It is also undisputed that Mr. Beyer makes his living fabricating stone countertops, which involves exposure to dust from cutting the stone pieces. (Depo at 147/17-150/17) Despite this history, Dr. Huang was interested only in whether there had been any changes in Mr. Beyer's work habits. Thus, when asked whether he had asked Mr. Beyer any questions about his employment and whether he could have had any exposures that might be causing some of the

16

symptoms he complained about, Dr. Huang explained that "we usually ask the patient, have there been any changes in the work environment, because he's been doing that for years.  So for the symptoms to change, usually there's some changes in the environment.  So I focused on what has changed.  So he said no.  I mean, it's a dusty place, I'm sure."[15]  (Depo at 151/8-21)

Dr. Huang also discounted the relevance of █████████████████████████ ████████████████████████████████████████████████████████████  For example, based █████████████████████████, Mr. Beyer reported to his doctor ████████████████████████████████████  (Depo at 329/5-20)  When asked about t█████████████████, Dr. Huang answered:  "So I think you're saying that if he had ████████████ before, whether his ██████████after the spray could have been attributed to – to the spray.  Normally if that's the – that's the case, then, you know, certainly the likelihood is lower, but the – even if ████████████ those are so many years ago, and he was pretty much fine, you know, afterwards."  (Depo at 327/22-328/5)  Dr. Huang attributed ████████████████to the fact that most of them were "nonspecific" and in the past.  (Depo at 330/11-334/6)

In regard to ██████████ complained of by Mr. Beyer, Dr. Huang would defer to a dermatologist because his specialty is asthma.[16]  He did not, however, seek out any opinion from a dermatologist to determine whether ███████████████████████was related to any exposure to SPF.  (Depo at 334/16-21)  Instead, Dr. Huang determined that there was no need to consult a dermatologist, because "these dermatologists, they have never seen spray

---

[15] In addition to asking no questions of Mr. Beyer, Dr. Huang made no effort to determine whether the State of Connecticut or the federal government had published anything regarding silica hazards from engineered stone countertops of the kind that Mr. Beyer typically works with. (Depo at 322/11-25)

[16] In addition to deferring to a dermatologist for █████████, Dr. Huang does not hold himself out as an expert on indoor air quality.  (Depo at 443/20-25)

ME1 23318944v.1

foam" and because there was commonality between ████████████████ and ████████████ of by some of the 13 subjects in his 2014 study.  (Depo at 334/22-335/15)  In the end, Dr. Huang admitted that he is not aware of any medical, peer reviewed, scientific literature that attributes to SPF ██████████████████████████ (Depo at 335/20-25)

Similarly, Dr. Huang is not aware of any study other than his own that associates with SPF █████████████████████████████████████████.[17]  (Depo at 354/10-356/6)  Nor, does he know what specific chemicals are associated with each of ██ ████████████████████████████ (Depo at 370/18-371/1)  Once again, Dr. Huang's opinion is nothing more than an assertion that because █████████████ followed the installation of SPF in their home, ████████████, therefore, be associated with the installation, regardless of any other potential causes.  In short, the *ipse dixit* of the expert.  Dr. Huang's opinion does not rest on a reliable foundation and should, therefore, be excluded by this Court.

First, it appears to have been driven, at least in part, by Dr. Huang's role in litigation.  *See Cloud v. Pfizer Inc.*, 198 F. Supp. 2d 1118, 1135 (D. Ariz. 2001). Second, the "causation" opinion he rendered "appears to be speculative, and not the tested hypothesis envisioned as the basis of scientific knowledge under Rule 702."  *Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1164 (S.D. Fla. 1996); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) ("Because of the deficiencies in the foundation of the opinion, the expert's resulting conclusions were 'mere speculation.'") *see Cloud*, 198 F. Supp. 2d at 1135-36 (expert rendered his opinion before reviewing relevant records).  Third, Dr. Huang "did not perform a clinical

---

[17] Regarding ████████████████████████████ Dr. Huang did not find documentation of those complaints in any of her medical records.  (Depo at 403/7-20)

ME1 23318944v.1

examination of the Plaintiff[s], nor did [he] even meet the Plaintiff[s] before forming [his] causation opinion in this case." *Id.* at 1166.  Fourth, other than the Huang Study, there are no other medical studies that support Dr. Huang's conclusions in this case.  *See Cloud*, 198 F. Supp. 2d at 1133 (studies on which expert relied did not support his conclusion)  Finally, and most importantly, Dr. Huang failed to eliminate other potential causes of ████████████ ████████     *Innis Arden Golf Club*, 629 F. Supp. 2d at 189; *Haggerty*, 950 F. Supp. at 1166; *Cloud*, 198 F. Supp. 2d at 1136.  *See also Glastetter v. Novartis Pharmaceuticals Corp.*, 107 F. Supp. 2d 1015 (E.D. Mo. 2000) (precluding expert based on a number of factors).

## CONCLUSION

Dr. Huang should be precluded from offering any opinions at trial of this matter.  In addition, to the extent Dr. Huang intends to testify as to any opinions or materials not set forth in his June 2015 expert report, he must be precluded from doing so by this Court.  As this Court has held, experts *may not* testify as to subjects not contained within the four-corners of their Rule 26(a)(2)(B) expert reports.  *See Great Am. Ins. Co. of NY v. Summit Exterior Works, LLC*, No. 2012 WL 459885 at *7 (D. Conn. Feb. 13, 2012) (precluding expert from testifying as to supplemental opinions not contained within Rule 26(a)(2)(B) expert report).

ME1 23318944v.1

Dated: September 15, 2016

Respectfully submitted,

Defendant,                                    Defendants,
Icynene Corporation,                          Johns Manville, Inc. and Johns Manville, Inc.
                                              d/b/a/ Johns Manville Insulation Systems,


By its Counsel,                                By their Counsel,
*/s/ Matthew J. Zamaloff*                      */s/ James E. Regan*
Matthew J. Zamaloff  (ct27509)                Catherine A. Mohan (ct00340)
Thomas H. Balestracci (ct29811)               James E. Regan (ct27282)
CETRULO LLP                                   Charles Ray (ct13211)
Two Seaport Lane                              McCARTER & ENGLISH, LLP
Boston, MA 02210                              CityPlace I, 185 Asylum Street
Phone:  (617) 217-5500                        Hartford, CT 06103
Fax:  (617) 217-5200                          Phone:  (860) 275-6700
Email:  mzamaloff@cetllp.com                  Fax:  (860)-724-3397
Email:  tbalestracci @cetllp.com              Email:  cmohan @mccarter.com
                                              Email:  jregan@mccarter.com
                                              Email:  cray@mccarter.com


Defendant,
Anchor Insulation,

By its Counsel,
*/s/ Robert O. Hickey*
Robert O. Hickey (ct19555)
Ryan Ryan Deluca, LLP
707 Summer Street
Stamford, CT 06901
Phone: (203) 357-9200
Fax:  (203) 357-7915
Email:  rohickey@ryandelucalaw.com

ME1 23318944v.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was filed electronically though the Court's

CM/ECF system on this 15th day of September, 2016. Notice of this filing will be sent by email

to all parties by operation of the Court's CM/ECF system.


<u>*/s/ James E. Regan*</u>
James E. Regan

ME1 23318944v.1