# EXHIBIT 4

2012 WL 459885
Only the Westlaw citation is currently available.
United States District Court,
D. Connecticut.

GREAT AMERICAN INSURANCE COMPANY OF N.Y. a/s/o The Connecticut Association for the Performing Arts, Inc.,
v.
SUMMIT EXTERIOR WORKS, LLC.

No. 3:10 CV 1669(JGM).
|
Feb. 13, 2012.

**Attorneys and Law Firms**

Jason B. Curtin, Stephen E. Goldman, Robinson & Cole, Hartford, CT, for Great American Insurance Company of N.Y. a/s/o The Connecticut Association for the Performing Arts, Inc.

Charles A. Deluca, James Justin Noonan, John Wade Cannavino, Jr., Ryan Ryan Deluca, LLP, Stamford, CT, for Summit Exterior Works, LLC.

*RULING ON MOTION IN LIMINE TO PRECLUDE DEFENDANT FROM INTRODUCING ANY EVIDENCE CONTRADICTING ITS TESTIMONY THAT THE EFIS WALL DETACHED ON OCTOBER 24, 2008, AND DEFENDANT'S EXPERT, THOMAS OLAM, FROM TESTIFYING TO POTENTIAL SOURCES OF WATER INFILTRATION, ALONG WITH ANY OTHER OPINIONS AND OBSERVATIONS NOT DISCLOSED IN HIS EXPERT REPORT*

JOAN GLAZER MARGOLIS, United States Magistrate Judge.

**\*1** On October 22, 2010, plaintiff, Great American Insurance Company of New York, the property insurer for The Connecticut Association of the Performing Arts, Inc., commenced this subrogation action against defendant Summit Exterior Works, LLC, arising out of roof and/or gutter demolition and construction work on the building that houses the Shubert Theater in New Haven, Connecticut. (Dkt.# 1). Plaintiff's Amended Complaint was filed on February 6, 2012. (Dkt. # 76; *see also* Dkt.72, 75).

On December 19, 2011, the parties consented to trial before this Magistrate Judge. (Dkt.# 56). Jury selection is scheduled for February 27, 2012, with trial to begin immediately thereafter. (Dkts.57, 62).

On January 23, 2012, plaintiff filed its Motion *In Limine* to Preclude Defendant from Introducing Any Evidence Contradicting Its Testimony that the EFIS Wall Detached on October 24, 2008, and Defendant's Expert, Thomas Olam, from Testifying to Potential Sources of Water Infiltration, Along with Any Other Opinions and Observations Not Disclosed in his Expert Report and brief in support (Dkts.67–68)[1], as to which defendant filed its brief in opposition one week later (Dkt.# 71)[2]; plaintiff filed its reply brief on February 2, 2012 (Dkt.# 73).[3]

For the reasons stated below, plaintiff's Motion *In Limine* (Dkt.# 67) is *granted in large part.*

### I. DISCUSSION

In this motion, plaintiff seeks to preclude defendant from: (1) arguing, claiming or introducing testimony or other evidence that the EFIS wall assembly common to Roofs 4 and 6 at the Shubert Theater detached from Roof 6 on any day other than October 24, 2008; and (2) allowing its expert, Thomas Olam, from testifying to potential sources of water infiltration, along with any other opinions and observations not disclosed in his expert report. (Dkt. # 67, at 1; Dkt. # 68, at 1–16). Specifically, on June 10, 2011, plaintiff took its Rule 30(b)(6) deposition of defendant, through its designee, Daniel Moriarty, who *unequivocally* testified that on Friday, October 24, 2008, the EFIS wall popped free of its connection to the Roof 6 roof desk, creating a gap in the roof, which he personally observed "towards the end of the day[,]" but that defendant took no effort to "seal up the gap between the roof and the [EFIS] wall" for two reasons, including that "[t]here was no bad weather forecast." (Dkt. # 68, at 4–5 & Moriarty Depo. at 78–79, 108–09, 113–14, 115).

Plaintiff's expert witness, Marc Caputo, explicitly relied on Moriarty's testimony, in forming his expert opinion in his report, dated September 2, 2011, and in his deposition testimony, given on September 27, 2011, that "the massive water entry problems into the Shubert Theater were caused by [defendant's] failure to provide proper temporary tie-ins at the south perimeter edge of Roof 6[and][s]pecifically they failed to seal the gap that formed

between the Roof 6 deck and the EFIS wall assembly...." (Dkt. # 68, at 5–6; Caputo Report at 9; Caputo Depo. at 115). A rain storm occurred in Southern Connecticut overnight on Saturday–Sunday, October 25–26, 2008. (Dkt. # 68, at 4).

**\*2** On November 3, 2011, almost five months after the Rule 30(b)(6) deposition, defendant disclosed the expert report of Thomas Olam, who opined that contrary to Moriarty's testimony, that the EFIS wall detached either during or after the storm due to the strong winds, but not before it; his deposition testimony on January 10, 2012 was consistent with his report. (Dkt. # 68, at 6; Olam Report at 2; Olam Depo. at 67, 83). Olam discounted Moriarty's testimony, because Moriarty "does have the ability sometimes to speak without thinking[,]" Olam did not review the photographs provided to him until the weekend before his deposition, and he never visited the site because he thought there was a possibility that the case would settle. (Dkt. # 68, at 6–7; Olam Depo. at 17, 44–45, 67, 87).[4] At his deposition, plaintiff contends that Olam also identified four other possible sources of water infiltration not disclosed in his expert report—flashing at the base of the EFIS wall, existing flashing at a pitch pocket, vertical joints in the EFIS wall, and the top edge of the EFIS wall—but that he had not "reached a final conclusion about the source of all the leakage." (Dkt. # 68, at 7–8, 14 & Olam Depo. at 45, 82).

Plaintiff objects to a "trial by ambush" in defendant changing the substantial nature of the case so close to trial in that Olam's expert opinion directly contradicts Moriarty's testimony at a Rule 30(b)(6) deposition that the EFIS wall detached on October 24, 2008. (Dkt. # 68, at 8–10). Plaintiff asserts that because it was "undisputed" that the wall detached on October 24, it did not need to depose the other members of defendant's crew who had witnessed the EFIS wall detachment that day. (Id. at 10). Plaintiff further argues that if defendant later determined that Moriarty "was somehow repeatedly mistaken in his Rule 30(b)(6) account of the movement of the EFIS wall," then it had a duty to so notify plaintiff of this error well before it disclosed Olam's report some five months later. (Id.). Plaintiff further contends that any conclusion that the EFIS wall detached after October 24, 2008 is "unfounded [,]" and is based, to a large extent, on Olam's "subjective observation" about Moriarty's inability to filter his thoughts before speaking. (Id. at 10–13).

Plaintiff further objects to having Olam's opinion being "a work in progress" as to other potential sources of water infiltration not disclosed in his expert report despite an imminent trial date, and thus should not be presented to the jury under FED.R.CIV.P. 37(c)(1). (Dkt. # 68, at

13–14 & Olam Depo. at 106). In addition, at his deposition on January 10, 2012, Olam testified as to his intention to reach a "final conclusion about the source of all the leakage [ ]" after he visited the Shubert Theater. (Dkt. # 68, at 14–16).

In its brief in opposition, defendant asserts that on September 19, 2011, just seventeen days after plaintiff disclosed Caputo as its expert witness, defendant served its Notice of Deposition, requesting five categories of documents. (Dkt. # 71, at 2–3 & Exh. A). When Caputo was deposed eight days later, on September 27, 2011, Caputo gave his entire file to plaintiff's counsel, who, in turn, agreed to provide copies to defense counsel. (Dkt. # 71, at 3 & Caputo Depo. at 149–50).[5] According to defense counsel, he reminded plaintiff's counsel of this commitment four additional times, on October 17 and 28, and November 1 and 4, 2011. (Dkt. # 71, at 3). On November 3, 2011, Olam disclosed his expert report, but with the caveat that his opinion would be supplemented upon receipt of Caputo's documentation. (Id.). Six days thereafter, on November 9, 2011, defense counsel again requested this file, which he received two days later, on November 11, 2011; five days thereafter, once defense counsel had an opportunity to review the materials, he forwarded them to Olam. (Id. at 3–4). The parties were unable to complete Olam's deposition before the discovery deadline of December 15, 2011 previously set by Judge Arterton (see Dkt. # 18), and agreed between themselves that the deposition could be held on January 10, 2012. (Dkt. # 71, at 4).[6] Thus, defendant argues that Olam should not be precluded regarding additional opinions after his November 3, 2011 expert report because plaintiff was responsible for the delay, especially because plaintiff failed to depose him prior to the December 15, 2011 discovery deadline. (Id. at 4–8). According to defendant, this testimony is "critical to ... [d]efendant's contest of liability in this case[,]" and plaintiff incurs "no prejudice from any claimed late disclosure." (Id. at 8–10). Defendant further argues that Olam is not precluded from disagreeing with Moriarty's testimony during the Rule 30(b)(6) deposition, which is not a judicial admission, particularly when Moriarty was deposed just eight months after this lawsuit was filed. (Id. at 10–15).

**\*3** In its reply brief, plaintiff argues that defendant should be estopped from contradicting Moriarty's "multiple affirmations" in which he served as defendant's Rule 30(b)(6) corporate representative, upon which plaintiff and Caputo relied. (Dkt. # 73, at 1–5). Plaintiff further replies that Olam should be precluded from testifying as to potential sources of water infiltration, along with any other opinions and observations not disclosed in his

expert report, and in particular, opinions formed after his deposition, especially when Caputo's expert file "consisted almost entirely of documents and photographs that were already in [defendant's] possession since September 2, 2011[,]" except for one set of color photographs sent by plaintiff's counsel on November 10, 2011, two months prior to Olam's deposition. (*Id.* at 5–7). Plaintiff argues that it will suffer "significant prejudice" if Olam testifies as to new opinions formed after his inspection of the premises, in that "there is inadequate time for the parties to re[-]engage in expert discovery." (*Id.* at 8–9).[7]

### A. RULE 30(b)(6) CONSIDERATIONS

In the context of summary judgment motions, a corporate party is "preclud[ed]" from introducing an affidavit of an employee that introduces "a theory of the facts that differs from that articulated by the designated representatives [ ]" in a Rule 30(b)(6) deposition, because to permit the consideration of such an affidavit would be inconsistent "with both the letter and spirit of Rule 30(b)(6)." *Rainey v. Am. Forest & Paper Ass'n, Inc.,* 26 F.Supp.2d 82, 94 (D.D.C.1998). The "plain[ ]" language of Rule 30(b)(6) "makes clear that a designee is not simply testifying about matters within his or her own personal knowledge, but rather is speaking for the corporation about matters to which the corporation has reasonable access." *Id.* (internal quotations & citations omitted). As such,

> By commissioning the designee as the voice of the corporation, the Rule obligates a corporate party to prepare its designee to be able to give binding answers in its behalf. Unless it can prove that the information was not known or was inaccessible, a corporation cannot later proffer new or different allegations that could have been made at the time of the [Rule] 30(b)(6) deposition.

*Id.* (internal quotations & citations omitted). An "eleventh hour alteration" that "works a substantial revision of defendant's legal and factual position[ ]" "is inconsistent with Rule 30(b)(6), and is precluded by it [,]" because "the Rule aims to prevent a corporate defendant from thwarting inquiries during discovery, then staging an ambush during a later phase of the case." *Id.* at 95 (citation omitted).[8]

In contrast, defendant argues that the *Rainey* ruling has been criticized by several other courts, *see, e.g., A.I. Credit Corp. v.. Legion Ins. Co.,* 265 F.3d 630, 637 (7th Cir.2001) (citations omitted), which have held instead that Rule 30(b)(6) does not "absolutely bind[ ] a corporate party to its designee's recollection unless the corporation shows that contrary information was not known to it or was inaccessible." *Id.*

**\*4** The Second Circuit has held that testimony at depositions constitutes " 'evidentiary admissions' that should be submitted to the jury for consideration, rather than 'judicial admissions' that act as concessions and remove a fact from contention." *Weiss v. Union Central Life Ins. Co.,* 28 Fed. Appx. 87, 89 (2d Cir.2002) (citation omitted). Defendant has cited to several cases that have held that "while Rule 30(b)(6) testimony is binding, it does not constitute a judicial admission that ultimately decides on issues. It can be contradicted and used for impeachment purposes." (Dkt. # 71, at 12–13 & n. 4 (internal quotations omitted), *citing, inter alia, A & E Prods. Group, L.P. v. Mainetti USA, Inc.,* No. 01 CV 10890, 2004 WL 345841, at \*7 (S.D.N.Y. Feb. 25, 2004) (regarding summary judgment motion)).[9] According to defendant, "[p]laintiff is of course entitled to cross-examine and impeach ... Moriarty at trial on [his] previous Rule 30(b)(6) testimony, but ... [p]laintiff cannot seek to preclude ... [d]efendant from presenting contradictory testimony." (Dkt. # 71, at 13). Defense counsel acknowledges that "[w]hile certainly presenting an expert who has contrary opinions to the party is an unenviable position, such discrepancy goes to the weight of the opinion, not the admissibility." (*Id.* at 15).

In *Pedroza v. Lomas Auto Mall, Inc.,* No. CIV. 07–0591 (JB/RHS), 2009 WL 1325440, at \*8 (D.N.M. Apr. 6, 2009), a corporate defendant indicated that it might need to substitute its representative at trial because Sharon Kunz, its corporate designee at its Rule 30(b)(6) deposition, was seriously ill; in their motion *in limine,* plaintiffs asked the Court to prevent the new representative from contradicting Kunz's earlier deposition testimony. The district judge rejected the *Rainey* approach, adopting the "majority" opinion that Rule 30(b)(6) testimony is "like other testimony[ ]" that can be "controverted or explained by the party":

> Rule 30(b)(6) requires organizations to designate representatives to speak for them. Absent [R]ule 30(b)(6), organizations would have no voice, being legal abstractions, or else speak in a cacophony of disparate statements, given the many people

that make up most organizations. Nothing in [R]ule 30(b)(6)'s language, however, indicates that, aside from officially speaking for the organization, the representative's testimony is somehow treated differently than others' testimony. Any fact witness may say one thing at a deposition and another at trial. If [R]ule 30(b)(6) meant for corporate representatives to be treated differently than other witnesses, presumably the rule would have said so.... Should [this defendant] end up with a new representative and should have representative's testimony begin to veer away from what Kunz said, ... [p]laintiffs have the means to impeach the new representative. This safeguard is sufficient.

*Id.* at *8 (footnote omitted). The court concluded that this corporate defendant "will have to live with the consequences of two witnesses telling two different stories." *Id.* at *9. *See also L–3 Commc'ns Corp. v. OSI Sys., Inc.,* No. 02 Civ. 9144(PAC), 2006 WL 988143, at *9 (S.D.N.Y. Apr. 13, 2006).

**\*5** The unique circumstances of this case compel the stricter application of Rule 30(b)(6), as asserted in *Rainey,* than the more flexible approach, as set forth in *A & E Prods. Group* and the majority line of decisions. First and foremost, defendant is the classic "mom and pop" operation—there is no one in a better position to "bind" Summit than its "principal operator," Daniel Moriarty. (*See* Dkt. # 69, at 4). Of the twelve potential defense witnesses listed in the Joint Pretrial Memorandum, filed January 27, 2012 (Dkt. # 69, at 4–6), only Moriarty is in a position to make "admissions" on defendant's behalf under FED.R.EVID. 802(d)(2); the other Summit employees include its foreman for the project, one roofer, one roofer journeyman, and five roofer apprentices. This was not an instance, for example, where several high level executives, any of whom could bind the corporate party, attended a lengthy conference during which the key events leading to the litigation were addressed; in such a circumstance, it would be expected that the other attendees might well have recollections that varied, in at least some respects, from the testimony of the Rule 30(b)(6) designee. In the words of the *Pedroza* decision, without Rule 30(b)(6), a corporation would "speak in a cacophony of disparate statements, given the many people

that make up most organizations." *Pedroza,* 2009 WL 1325440, at *8. Here, Moriarty is the driving force, and the only driving force, behind Summit. Plaintiff had no reason to seek the depositions of defendant's foreman on the job, or any of the seven subordinate employees, when Moriarty had testified *unequivocally* that the EFIS wall had "popped" on Friday, October 24, 2008.[10]

Second, and equally important, the multiple other cases cited by defendant (Dkt. # 71, at 11–13 & n. 4), all concern divergent renditions by fact witnesses. Not one of them raised the unusual circumstance raised here—that defendant's expert witness will be contradicting and criticizing defendant's key factual witness as to a critical matter for which the key factual witness had personal knowledge that the expert witness did not, and based upon purely subjective feelings of the expert witness about the capabilities of the key factual witness. *See* Section I.B. *infra.*

Defendant is correct that Moriarty did not witness the EFIS wall "popping" from the original masonry wall, which occurred after he had made his morning visit to the site on Friday, October 24, 2008. (Dkt. # 71, at 14 & Moriarty Depo. at 114). However, he witnessed, with his own eyes, "towards the end of the day[,]" during his afternoon visit that same day, that the EFIS wall had "popped free of its connection to the Roof 6 roof desk, creating a gap in the roof." (Dkt. # 68, at 4–5; Moriarty Depo. at 78–79, 108–09, 113–15; Dkt. # 73, at 4). Moreover, even had Moriarty not visited the site in the afternoon that day, as a Rule 30(b)(6) designee for his company, he was entitled to rely upon the reports of his employees who did witness the incident. (Dkt. # 73, at 4).

### B. "FACTUAL DISCONNECT" BETWEEN DEFENDANT'S AND OLAM'S TESTIMONY

**\*6** As the United States Supreme Court held in *Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 242 (1993), in affirming a trial judge's having set aside a jury verdict, "When an expert opinion is not supported by sufficient fact to validate it in the eyes of the law, or when indisputable record facts contradict, or otherwise render the opinion unreasonable, it cannot support a jury's verdict." (citation omitted). The Second Circuit similarly has ruled that "expert testimony should be excluded if it is speculative or conjectural, or it if is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison...." *Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir.1996)(internal quotations & citations omitted).

A case closely parallel to this one is *Barrett v. Black & Decker (U.S.) Inc.,* No. 06 Civ.1970(SCR)(MDF), 2008 WL 5170200 (S .D.N.Y. Dec. 9, 2008), a product liability action, in which plaintiff's expert, in rendering his expert opinion, relied upon events which varied from those testified to by plaintiff at his deposition as to how the accident occurred. *Id.* at *3–4. Among the reasons defendant sought to exclude this expert from testifying was that "his opinions are without factual foundation and contradict [p]laintiff's testimony." *Id.* at *6. The district court agreed:

> By contradicting [p]laintiff's testimony about how the accident occurred, [the expert] is seeking to provide his own version of an accident he did not witness.... As such, the undisputed factual disconnect between [the expert's] and [p]laintiff's versions of the accident at issue is reason enough to preclude [the expert's] expert testimony.

*Id.* at *8 (citation omitted). *See also Davidov v. Louisville Ladder Group, LLC,* No. 02 Civ. 6652(LLS), 2005 WL 486734, at *2 (S.D.N.Y. Nov. 1, 2005)("[A]n expert's opinion which is not based on the evidence in the case is little more than speculation and it cannot be the basis of a verdict in conflict with the uncontradicted evidence in the case."), *aff'd,* 169 Fed. Appx. 661 (2d Cir.2006).

As Olam testified, the sole basis upon which he discounted Moriarty's testimony as to the timing of the detachment was his belief that Moriarty was not "paying enough attention to make that statement accurately[,]" and that Moriarty "does have the ability sometimes to speak without thinking." (Dkt. # 68, at 12 & Olam Depo. at 67, 87). Olam had limited familiarity with Moriarty, having met him about twenty years earlier and having had no recent contact with him since then. (Dkt. # 68, at 12 & Olam Depo. at 87). His tangential exposure to Moriarty is insufficient, in and of itself, to disregard his repetitive, and otherwise uncontroverted, testimony that the EFIS wall popped sometime during the day on Friday, October 24, 2008.

As in *Barrett,* there is an "undisputed factual disconnect" between Olam's and Moriarty's versions of the timing of the EFIS wall popping, which is "reason enough to preclude [Olam's] expert testimony." *Barrett,* 2008 WL 5170200, at *8 (citation omitted).

**\*7** As plaintiff emphasized in its reply brief, this motion seeks only "to preclude ... Olam from testifying to any date other than October 24, 2008, as the date on which the EFIS wall 'popped,' moved, or detached[,]" and "not the effects of that movement." (Dkt.# 73).

### C. OTHER OPINIONS NOT DISCLOSED IN OLAM'S EXPERT REPORT

An expert report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them ..." and an expert witness has an affirmative duty to supplement his or her report "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing...." FED. R. CIV. P .26(a)(2)(B)(I)(emphasis added) & 26(e)(1)(A), (2). "If a party fails to provide information ... as required by Rule 26(a) or (e), the party is not allowed to use that information ... to supply evidence ... at a trial, unless the failure was substantially justified or is harmless...." FED.R.CIV.P. 37(c)(1). "Rule 37(c)(1)'s preclusionary sanction is automatic absent a determination of either substantial justification or harmlessness." *Innis Arden Golf Club v. Pitney Bowes, Inc.,* 3:06 CV 1352(JBA), 2009 WL 5873112, at *2 (D.Conn. Feb. 23, 2009) (internal quotations & citation omitted). As one district judge observed last year, "experts are not free to continually bolster, strengthen, or improve their reports by endlessly researching the issue they already opined upon, or to continually supplement their opinions." *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.,* 769 F.Supp.2d 269, 278 (S.D.N.Y.2011)(internal quotations & citation omitted). This concern is particularly paramount where, like here, the new matters not previously disclosed in expert reports are raised after the close of discovery and after a trial date has been set. *Point Prods. A.G. v. Sony Music Entm't, Inc.,* 93 Civ. 4001, 2004 WL 345551, at *7–13 (S.D.N.Y. Feb. 23, 2004).

Plaintiff complains that Olam's "opinion is a work in progress" despite the imminent approach of trial, in that Olam expressed his intention to visit the Shubert Theater, after the deposition if the case did not settle, in order to make a "determination of the correlation between the point of entry and the damage." (Dkt. # 68, at 14–15).

Defendant argues that there was "substantial justification" under Rule 37(c)(1) due to plaintiff's delay in providing materials from Caputo's file to Olam, which was aggravated by plaintiff's further delay in scheduling Olam's deposition. (Dkt. # 71, at 2–10). In its reply brief, however, plaintiff has responded that "Caputo's expert

file consisted almost entirely of documents and photographs that were already in Summit's possession since September 2, 2011 [,]" and that of the approximately sixteen categories of document upon which Caputo relied in forming his expert opinions, defendant was only missing only one set of color copies of photographs that Caputo had taken in spring 2009, copies of which were forwarded to defense counsel on November 11, 2011. (Dkt. # 73, at 6 & Caputo Report at 1–3). Plaintiff's counsel described these photographs "of limited value," and no different from what Olam would have observed if he had made his own inspection of the Shubert Theater. (Dkt. # 73, at 6). In addition, plaintiff appropriately argues that the delay in scheduling Olam's deposition gave Olam two additional months (from November 2011 to January 2012) to prepare a supplemental report before he was deposed, if the additional photographs altered his opinion, had he chosen to review them prior to the weekend before his deposition. (Dkt. # 68, at 7; Olam Depo. at 44–45; Dkt. # 73, at 6–7).

**\*8** Similarly, defendant cannot argue that these supplemental opinions are "harmless" under Rule 37(c). Defendant is correct that in his November 3, 2011 expert report, Olam identified three "other potential sources of water entry[,]" none of which were defendant's responsibility: the vertical joint between the EFIS wall and adjoining brick masonry, an open joint between the duct work and EFIS change in elevation wall, and openings in the flexible duct connector(s). (Dkt. # 71, at 8–10 & Olam Report, at 3, ¶ 4). However, at his deposition, Olam identified four possible sources of water infiltration—flashing at the base of the EFIS wall, existing flashing at a pitch pocket, vertical joints in the EFIS wall, and the top edge of the EFIS wall—but that he had not "reached a final conclusion about the source of all the leakage." (Dkt. # 68, at 7–8, 14 & Olam Depo. at 45, 82; *see also* Dkt. # 73, at 7–9). To the extent that any of four possible sources differ from the three explicitly mentioned in Olam's November 3, 2011 expert report, he is precluded to testifying about them. In addition, Olam is precluded from testifying as to any new opinions he forms from any post-deposition visit to the Shubert Theater.[11]

### II. CONCLUSION

Accordingly, for the reasons stated above, defendant's Motion *In Limine* to Preclude Defendant from Introducing Any Evidence Contradicting Its Testimony that the EFIS Wall Detached on October 24, 2008, and Defendant's Expert, Thomas Olam, from Testifying to Potential Sources of Water Infiltration, Along with Any Other Opinions and Observations Not Disclosed in his Expert Report (Dkt. # 67) is *granted in large part.*

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 459885

---

Footnotes

1   The following five exhibits are attached to plaintiff's brief: excerpts from the deposition of Daniel Moriarty, taken on June 10, 2011 ["Moriarty Depo."](Exh. 1); copy of expert report of Marc Caputo, dated September 2, 2011 ["Caputo Report"](Exh. 2); excerpts from the deposition of Marc Caputo, taken on September 27, 2011 ["Caputo Depo."](Exh. 3); copy of expert report of Thomas Olam, dated November 3, 2011 ["Olam Report"] (Exh. 4); and excerpts from the deposition of Thomas Olam, taken on January 10, 2012 ["Olam Depo."](Exh. 5).

2   The following four exhibits are attached: copy of defendant's Notice of Deposition for Caputo, dated September 19, 2011 (Exh. 1); additional excerpts from the Caputo Deposition (Exh. 2); copy of defendant's Rule 26(a)(2) Expert Disclosure, dated November 3, 2011, with attachments (Exh. 3); and additional experts from the Moriarty Deposition (Exh. 4).

3   The following three exhibits are attached: additional excerpts from the Moriarty Deposition (Exh. 1); another copy of the Caputo Report (Exh. 2); and additional excerpts from the Olam Deposition (Exh. 3).

4   Olam testified that he intended to visit the site after his deposition. (Dkt. # 68, at 10, n. 6 & Olam Depo. at 106).

5   Plaintiff's counsel disagrees with this recitation, representing instead that Caputo indicated at his deposition that he wanted to retain custody of his file and offered to make a copy of his file for defendant, but then later it turned out that plaintiff's counsel needed to make the copies instead. (Dkt. # 73, at 6, n. 4).

6   The controversy here typifies the perils counsel run when they alter a scheduling order carefully crafted by a judge,

**Great American Ins. Co. of NY v. Summit Exterior Works, LLC, Not Reported in...**
2012 WL 459885

which scheduling order provides appropriate time in which to remedy glitches like this one, such as by a holding a supplemental deposition.

7       *See* note 6 *supra.*

8       As previously noted, *see* note 6 *supra,* there is insufficient time for plaintiff to depose employees of defendant to determine if their testimony differs from that of the defendant's principal, who himself visited the site during the afternoon of Friday, October 24, 2008. Even if time permitted these depositions, however, the *Rainey* decision explicitly rejected supplemental depositions as a "cure for this violation":
> If such were the remedy, corporate parties would have every incentive to "bandy" or attempt "trial by ambush," as the only downside to their strategy would be that their adversary might eventually procure access to their theretofore-concealed witness. This incentive structure would eviscerate the force of Rule 30(b)(6), and would delay litigation, heighten suspicions, and obfuscate the discovery process. Rule 30(b)(6) was designed to prevent such consequences....
> *Id.* at 96.

9       It is worth noting that there *has been* a judicial admission as to this fact. On December 23, 2011, Alterra Excess & Surplus Ins. Co. commenced a declaratory judgment action against Summit and Great American, 11 CV 2001(MRK). In its complaint, Alterra, which is Summit's insurer (Complaint, ¶¶ 1–2, 13), specifically alleges:
> 17. When Summit (specifically, Dan Moriarty's crew) demolished roof # 6, a section of the EFIS wall had been pulled or pushed away from the structure leaving a 3 inch gap for water to enter....
> 18. On *Friday, October 24, 2008,* Dan Moriarty (of Summit) looked at various internet weather services late in the afternoon. Although a rain event was forecasted, ... Moriarty determined that it was only predicted to "mist [,]" and therefore, took no special or extra precautions to guard against a storm of greater magnitude. Summit attempted to address the 3 inch gap of the EFIS wall by placing Tyvek paper sheeting as a temporary weekend measure.... Moriarty left the property *around 4:00 p.m. on Friday, October 24, 2008.*
> (emphasis added). Thus, defendant's insurer concedes in its Complaint that the popping of the EFIS wall occurred sometime on Friday, October 24, 2008, and not during the storm on Saturday–Sunday, October 25–26, 2008.

10      Defense counsel is correct that plaintiff could have served Requests for Admission upon defendant (Dkt. # 71, at 14), but it was also reasonable for plaintiff to rely on Moriarty's definitive, and until recently, unopposed testimony.

11      Both parties refer to the four-part test in *Haas v. Del. & Hudson Ry. Co.,* 282 Fed. Appx. 84 (2d Cir.2008), when considering whether to exclude evidence under Rule 37(c)(1). *See also Softel, Inc. v. Dragon Med. & Scientific Comm., Inc.,* 118 F.3d 955, 961 (2d Cir.1997), *cert. denied,* 523 U.S. 1020 (1998). These four factors are: "(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." 282 Fed. Appx. at 86 (citation omitted).
The first and third factors parallel the substantial justification and harmlessness language found in Rule 37(c)(1). Neither side seeks a continuance here (Dkt. # 71, at 10; Dkt. # 73, at 9), so the fourth factor has no significance. As to the second element, defendant understandably argues that Olam's testimony is "critical to ... [d]efendant's contest of liability in this action[,]" in that it is "critical" to have Olam "testify regarding any deficiencies" in Caputo's expert opinions. (Dkt. # 71, at 8). However, as plaintiff emphasizes in its reply brief, it "does not request that ... Olam be precluded as to all of his opinions, only those that he failed to disclose prior to his deposition." (Dkt. # 73, at 7).
Therefore, the balancing test under *Haas* does not change the conclusion reached here. *See Innis Arden,* 2009 WL 5863112, at *2, n. 5.

---

**End of Document**                              © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**In re Rezulin Products, Not Reported in F.Supp.2d (2004)**
2004 WL 2884327, Prod.Liab.Rep. (CCH) P 17,263

2004 WL 2884327
United States District Court,
S.D. New York.

In re: REZULIN PRODUCTS Liability Litigation (MDL No. 1348)

No. MDL 1348, 00 Civ. 2843(LAK).
|
Dec. 10, 2004.

**Attorneys and Law Firms**

Maria C. Young, Law Office of Ronald R. Benjamin, for Plaintiff.

David Klingsberg, Bert L. Slonim, Maris Veidemanis, Kaye Scholer LLP, for Defendant Warner–Lambert LLC.

MEMORANDUM OPINION

KAPLAN, J.

**\*1** This Document Relates to: No. 01 Civ. 1040
Plaintiff's decedent in this product liability case, Albert Ruggiero, died on August 24, 1998. It is undisputed that the cause of death was hepatic failure caused by cirrhosis.[1] Plaintiff attributes this to Mr. Ruggiero's ingestion of Rezulin. Defendant moves for summary judgment dismissing the complaint on the ground, *inter alia,* that plaintiff cannot adduce evidence sufficient to raise a genuine issue of material fact as to whether Rezulin was capable of causing the cirrhosis that resulted in Mr. Ruggiero's death. In other words, they challenge plaintiff's ability to get to the jury on the issue of general causation.

*Facts*

Plaintiff relies upon the declaration of Douglas T. Dieterich, M.D., a highly qualified physician who is board certified in internal medicine and gastroenterology and who has expressed the opinion "with reasonable medical certainty that Albert Ruggerio's [*sic*] liver disease was caused by his taking Rezulin."[2] His declaration, however, gives no basis for this assertion save the conclusory statement that "Rezulin has been reported in many published incidences [*sic*] to cause liver failure and death."[3] Even this statement was undermined by his deposition testimony:

> "Q. And Dr. Dieterich, can you cite any studies published in any medical or scientific literature which conclude that Rezulin causes cirrhosis? A. I certainly have seen that Rezulin causes liver failure and death.
>
> "Q. Sitting her today, Dr. Dieterich, as a plaintiff's expert in this matter, you're not able to cite any studies published in the medical or scientific literature which conclude that Rezulin can cause cirrhosis, correct? A. No.
>
> "Q. And, Dr. Dieterich, can you cite any studies published in the medical or scientific literature that concludes that Rezulin can exacerbate or accelerate a preexisting liver disease? A. I can't cite medical references, but it's my opinion that that's the case.
> "Q. But sitting here today as plaintiff's expert in this matter, you're not able to cite any studies, apart from your own personal opinion, but any scientific studies published in the literature that concludes that Rezulin can exacerbate or accelerate pre-existing liver disease; is that correct? A. That's correct."[4]

There is no other basis given for Dr. Dieterich's opinion in his declaration or deposition.

*Discussion*

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[5] Where the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.[6] In that event, the nonmoving party must come forward with admissible evidence[7] sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.[8]

**\*2** Causation in toxic tort cases has two components: general and specific.[9] "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific

**In re Rezulin Products, Not Reported in F.Supp.2d (2004)**
2004 WL 2884327, Prod.Liab.Rep. (CCH) P 17,263

causation is whether a substance caused a particular individual's injury."[10] As explained in the Federal Judicial Center's *Reference Guide on Medical Testimony:*

> "General causation is established by demonstrating, often through a review of scientific and medical literature, that exposure to a substance can cause a particular disease (e.g., that smoking cigarettes can cause lung cancer). Specific, or individual, causation, however, is established by demonstrating that a given exposure is the cause of an individual's disease (e.g., that a specific plaintiff's lung cancer was caused by his smoking)."[11]

A plaintiff must establish both in order to prevail. In consequence, plaintiff can defeat the motion only if she has admissible evidence sufficient to go to the jury on the issue of general causation. Defendant argues that Dr. Dieterich's opinion is not admissible because it does not pass muster under *Daubert v. Merrell Dow Pharmaceuticals*[12] and that plaintiff's case therefore must be dismissed.

The standard governing a district court's determination whether to admit scientific or other expert testimony is familiar. Federal Rule of Evidence 702 provides:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

Rule 702 incorporates principles established in *Daubert,* in which the Court charged trial courts with a gatekeeping role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[13]

*Daubert* set forth the criteria a trial court is to apply in ruling on expert testimony. The trial court must determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."[14] The Court explained further that this requires "a preliminary assessment of whether the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue"—in essence, whether it is reliable.[15]

The *Daubert* Court stressed that the reliability inquiry required by Rule 702 is "a flexible one" and articulated four relevant factors while leaving open the possibility of other pertinent considerations: (1) whether the expert's theory "can be (and has been) tested;" (2) whether the theory "has been subjected to peer review and publication;" (3) the "known or potential rate of error;" and (4) whether the theory has " 'general acceptance.' "[16] The proponent of expert testimony must demonstrate admissibility by a preponderance of proof.[17]

**\*3** In undertaking this inquiry, a district court must focus on the "principles and methodology" employed by the expert, not on the conclusions reached.[18] Nevertheless, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[19]

The 2000 amendment to Rule 702 added three standards that proffered testimony must meet to be admissible: "(1) the testimony [must be] based upon sufficient facts or data, (2) the testimony [must be] the product of reliable principles and methods, and (3) the witness [must have] applied the principles and methods reliably to the facts of the case." The Advisory Committee Notes explain that the amendment was intended to affirm *Daubert'* s designation of the trial court as gatekeeper and "provide[ ] some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony."[20] The standards set forth in Rule 702, however, were not intended to displace the factors identified in *Daubert.*

Measured against these standards, Dr. Dieterich's declaration and testimony fall far short. The only basis he offered for his opinion was the generalization that he had seen unspecified studies that, in his view, supported the proposition that Rezulin causes liver failure and death. But it is undisputed that the cause of death here was liver failure caused by cirrhosis. Dr. Dieterich was unable to point to any studies or, for that matter, anything else that suggested that cirrhosis could be caused or exacerbated by Rezulin.

Plaintiff suggests that Dr. Dieterich's opinion properly rested on his review of Mr. Ruggiero's medical records.[21]

**In re Rezulin Products, Not Reported in F.Supp.2d (2004)**
2004 WL 2884327, Prod.Liab.Rep. (CCH) P 17,263

Although she does not say so in as many words, she seems to suggest that the opinion is admissible on the basis that it is the result of a differential diagnosis.

"Differential diagnosis is a patient-specific process of elimination that medical practitioners use to identify the 'most likely' cause of a set of signs and symptoms from a list of possible causes."[22] "In performing a differential diagnosis, a physician begins by 'ruling in' all scientifically plausible causes of the plaintiff's injury. The physician then 'rules out' the least plausible causes of injury until the most likely cause remains."[23] As one court has written:

> "The process of differential diagnosis is undoubtedly important to the question of 'specific causation.' If other possible causes of an injury cannot be ruled out, or at least the possibility of their contribution to causation minimized, then the 'more likely than not' threshold for proving causation may not be met. *But, it is also important to recognize that a fundamental assumption underlying this method is that the final, suspected 'cause' remaining after this process of elimination must actually be capable of causing the injury. That is, the expert must 'rule in' the suspected cause as well as 'rule out' other possible causes. And, of course, expert opinion on this issue of 'general causation' must be derived from scientifically valid methodology.*"[24]

*4 Thus, differential diagnosis does not "speak to the issue of general causation. [It] assumes that general causation has been proven for the list of possible causes" that it rules in and out in coming to a conclusion.[25]

The Court is mindful that another district judge in this circuit seems to have come to a different view, stating that "[d]ifferential diagnosis is a reliable basis to prove general causation in this circuit," relying principally on *McCullock v. H .B. Fuller Co.*[26] But the view that differential diagnosis may be sufficient to establish general causation is not borne out by *McCullock.* The circuit there merely registered its approval of the expert's reliance on a variety of sources to arrive at an opinion as to both general and specific causation. It is not at all clear that the Court regarded differential diagnosis as probative of general causation, let alone that a district court lacks discretion to conclude in an individual case that an expert's opinion as to general causation based on an unreliable differential diagnosis must be received in evidence.

This case illustrates the fundamental problem with differential diagnosis even assuming that Dr. Dieterich relied upon it, which is not really clear. The doctor has not offered any reliable basis for concluding that Rezulin is capable of causing the cirrhosis that caused the liver failure that resulted in Mr. Ruggiero's death. In other words, he has offered no reliable ground upon which Rezulin may be "ruled in" as a plausible cause of the cirrhosis.

No one questions Dr. Dieterich's qualifications or good faith. It is possible, moreover, that time and medical research will prove him right. But *Daubert* requires much more—it requires that his opinion be shown to rest on sufficient facts and data and that it be the product of reliable principles and methods properly applied to the facts of the case.

None of these criteria has been satisfied here. There has been no specification of the facts and data upon which Dr. Dieterich relied. There has been no showing that he applied reliable principles and methods in reaching his conclusion. In consequence, his opinion is not admissible in evidence.

*Conclusion*

As plaintiff has offered no admissible evidence of general causation, which is an essential element of her case, defendant's motion for summary judgment dismissing the complaint is granted.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 2884327, Prod.Liab.Rep. (CCH) P 17,263

Footnotes

1    Womack Decl. ¶ 10; *compare* Def. 56.1 St. ¶ 10 *with* Pl. 56.1 St. *passim.*

2    Dieterich Decl. ¶ 2; *see id.* ¶ 10.

**In re Rezulin Products, Not Reported in F.Supp.2d (2004)**
2004 WL 2884327, Prod.Liab.Rep. (CCH) P 17,263

| | |
|---|---|
| 3 | *Id.* ¶ 8. |
| 4 | Def. Reply Mem. Ex. A (Dieterich Dep.) 77–78. |
| 5 | *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *White v. ABCO Eng'g Corp.,* 221 F.3d 293, 300 (2d Cir.2000); *see also* Fed.R.Civ.P. 56(c). |
| 6 | *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986); *Virgin At. Airways Ltd. v. British Airways PLC,* 257 F.3d 256, 273 (2d Cir.2001). |
| 7 | *See, e.g., Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 269 F.3d 114, 123–24 (2d Cir.2001); *id.,* 164 F.3d 736, 746 (2d Cir.1998); *Raskin v. Wyatt Co.,* 125 F.3d 55, 65–66 (2d Cir.1997). |
| 8 | *E.g., Nebraska v. Wyoming,* 507 U.S. 584, 590 (1993) (when nonmoving party bears burden of proof at trial, moving party is entitled to summary judgment if nonmovant fails to make showing on essential element of its claim); *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995) ("In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.") (citing *Celotex,* 477 U.S. at 322–23). |
| 9 | *See, e.g., Raynor v. Merrell Pharms., Inc.,* 104 F.3d 1371, 1376 (D.C.Cir.1997). |
| 10 | *In re Breast Implant Litig.,* 11 F.Supp.2d 1217, 1224 (D.Colo.1998). |
| 11 | Mary Sue Henifin, Howard M. Kipen & Susan R. Poulter, *Reference Guide on Medical Testimony, in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 444 (Federal Judicial Center, 2d ed.2000). |
| 12 | 509 U.S. 579 (1993). |
| 13 | *Id.* at 589. |
| 14 | *Id.* at 592. |
| 15 | *Id.* at 592–93. |
| 16 | *Id.* at 593–94. |
| 17 | *Id.* at 592 n. 10. |
| 18 | *Id.* at 594–95. |
| 19 | *General Electric Co. v. Joiner,* 522 U.S. 136, 146 (1997). |
| 20 | FED.R.EVID. 702 Advisory Committee Note (2000). |
| 21 | Pl. Mem. 4. |
| 22 | *Hall v. Baxter Healthcare Corp.,* 947 F.Supp. 1387, 1413 (D.Or.1996). |

**In re Rezulin Products, Not Reported in F.Supp.2d (2004)**
2004 WL 2884327, Prod.Liab.Rep. (CCH) P 17,263

23  *Glastetter v. Novartis Pharms Corp.,* 252 F.3d 986, 989 (8th Cir.2001).

24  *Cavallo v. Star Enter.,* 892 F.Supp. 756, 771 (E.D.Va.1995), *aff'd on this ground, rev'd on other grounds,* 100 F.3d 1150 (4th Cir.1996).

25  *Hall,* 947 F.Supp. at 1413 (emphasis added). *See also, e . g., Glastetter v. Novartis Pharms. Corp.,* 252 F.3d 986, 992 (8th Cir.2001) (affirming district court's exclusion of plaintiff's experts because they lacked a proper basis for "ruling in" drug in question as a potential cause of alleged injury); *Black v. Food Lion, Inc.,* 171 F.3d 308, 313–14 (5th Cir.1999) ("Dr. Reyna's use of a general methodology cannot vindicate a conclusion for which there is no underlying medical support."); *Hollander v. Sandoz Pharmaceuticals Corp.,* 289 F.3d 1193 (10th Cir.2002) (affirming exclusion of opinion based on differential diagnosis offered to prove general causation); *Soldo v. Sandoz Pharmaceuticals Corp.,* 244 F.Supp.2d 434, 516 (W.D.Pa.2003) ("differential diagnosis is not a reliable methodology for determining general causation"); *In re Breast Implant Litig.,* 11 F.Supp.2d at 1230 (differential diagnosis not reliable as to general causation; "expert opinion on ... issue of "general causation" must be derived from a scientifically valid methodology"); *Cavallo,* 892 F.Supp. at 771 (differential diagnosis not usable in toxic tort case to prove general causation because "a fundamental assumption underlying this method is that the final, suspected 'cause' remaining after this process of elimination must actually be capable of causing the injury"), *aff'd in relevant part, rev'd in part,* 100 F.3d 1150, 1159 (4th Cir.1996), *cert. denied,* 522 U.S. 1044 (1998); Philip Cole, *Causality in Epidemiology, Health Policy, and Law,* 27 ENVTL. L. REP. 10279, 10284 (June 1997) ("[A]n agent cannot be considered to cause the illness of a specific person unless it is recognized as a cause of that disease in general.").

26  *Perkins v. Origin Medsystems, Inc.,* 299 F.Supp.2d 45, 57 (D.Conn.2004) (citing *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038 (2d Cir.1995)).

---

**End of Document**   © 2016 Thomson Reuters. No claim to original U.S. Government Works.