UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Richard BEYER and Monica BEYER,<br>　　*Plaintiffs*,<br>　　　　*v.*<br>Anchor Insulation Co. Inc.,<br>　　*Defendant*. | Civil No. 3:13-cv-1576 (JBA)<br><br>February 28, 2017 |

**RULING ON PLAINTIFFS' MOTION TO PRECLUDE EXPERT TESTIMONY**

In this product liability case involving claims of injury to property stemming from Defendant's installation of spray polyurethane foam ("SPF") insulation, Plaintiffs Richard and Monica Beyer ("Plaintiffs" or the "Beyers") move [Doc. # 207] to preclude the testimony of three experts: George Thompson, Ph.D., Mason Knowles, and James Poole, Ph.D. Plaintiffs' motion to preclude testimony is granted in part and denied in part as set forth below.

**I.   Background**

A fuller description of the facts of the case, taken in the light most favorable to the Plaintiffs, has been laid out in the Court's Ruling [Doc. # 268] on Defendant's Motion for Summary Judgment. The Beyers engaged Anchor to install SPF in their home in the late summer of 2010, and Anchor did so on several days in September and October, 2010. Mr. and Mrs. Beyer were present in the house during the installation and Mr. Beyer personally observed some of the installation process, but neither wore protective gear. After the installation, the Beyers began experiencing a variety of symptoms. Mr. Beyer complained of headache, tongue-swelling, a metallic taste in his mouth, loss of memory, and boils on his skin. Mrs. Beyer complained primarily of headache and fatigue, with some breathing issues and heart palpitations a year or two after installation of the foam.

Worried about the health effects of the SPF and displeased with the foam, which made loud cracking and popping sounds at night and shrank after installation, causing holes to appear and damaging the surfaces onto which it had been sprayed, the Beyers negotiated with Anchor to have it removed. Approximately eleven months after it was installed, Anchor removed a large portion of the SPF. Some foam remains in the house today. The Beyers later filed the instant suit.

## II. Legal Standard

Plaintiffs move to preclude the testimony of three defense experts under Rule 702 of the Federal Rules of Evidence and the standards established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 was amended in 2000 to address *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny, including *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999). *See* Fed. R. Evid. 702, advisory committee note to 2000 Amendment.

Fed. R. Evid. 702 provides that

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Thus, reliability is the touchstone of the *Daubert* inquiry proper, and the Supreme Court set out a list of non-exhaustive factors for trial courts to consider in determining whether an expert's reasoning and methodology are sufficiently reliable to be presented to the fact finder: (1) whether the theory or technique on which the expert relies has been or could be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or

2

potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the theory or technique has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94; *see also Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005).

The test of reliability is a "flexible" one depending on the "nature of the issue, the expert's particular expertise, and the subject of his testimony" and no one factor will necessarily be determinative of the reliability of an expert's testimony, because the trial court need only "consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Kumho Tire*, 526 U.S. at 150, 152; *accord Amorgianos*, 303 F.3d at 265–66 (2d Cir. 2002). As the Second Circuit emphasized in *Amorgianos*, the determination of reliability requires the Court to consider "a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267.

*Daubert* makes clear that the district court is assigned the role of gatekeeper and the first step in exercising that function—prior to any inquiry into reliability—is to determine whether the proffered testimony is relevant to a fact at issue in the case. *Amorgianos*, 303 F.3d at 265. This inquiry is especially necessary here, because the parties' Daubert motions were submitted prior to the Court's ruling on Defendant's motion for summary judgment, which narrowed the issues in this case. The Ruling precluded the proffered testimony of Plaintiffs' medical causation expert was precluded, although Plaintiffs were permitted to proceed on their claims of property damage. (Ruling on Motion for Summary Judgment [Doc. # 268] at 41.) Thus, defense experts' testimony related to medical causation of Plaintiffs' symptoms will be excluded as not relevant.

1. **Dr. George Thompson**

Dr. Thompson is a toxicologist who has been president and CEO of Chemical Compliance Systems, Inc., a company that performs chemical, product, manufacturing process and waste stream hazard and risk assessments since 1985. He has published peer reviewed articles and over twenty books. Plaintiffs do not challenge his qualifications as an expert.[1]

Dr. Thompson uses a "root cause analysis" methodology to determine the cause of Plaintiffs' injuries. (Ex. 2 ("Thompson Report") to Mot. to Exclude [Doc. # 207-3] at 3, 4.) He reaches the following conclusions, to which he is prepared to testify: (1) Mr. Beyer was never exposed to high concentrations of isocyanate, because he would have suffered an immediate reaction if he had been exposed; (2) Plaintiffs have not been exposed to off-gassing of SPF constituent chemicals based on the results of air sampling and the chemistry of the chemicals, which have a low vapor point and thus do not evaporate; (3) there is no causal relationship between Plaintiffs' symptoms and the SPF installation, (4) the chemical opinions expressed by Dr. Nicewicz were not scientifically credible, (5) the indoor air quality opinions offered by Mr. Cude were not scientifically credible, and (6) Plaintiffs' claims of physical injury are unsupported by the facts.[2] (*Id.* at 16.)

Plaintiffs focus their briefing on the claimed unreliability of Dr. Thompson's testimony with respect to the cause of Plaintiffs' symptoms and argue that Dr. Thompson simply failed to take into account all of the data, including certain purported admissions contained in the Johns

---

[1] Plaintiffs have submitted only the body of the Thompson report, not his CV or appendices listing the references on which he relied that were attached to the report as appendices. (*See* Ex. 2 ("Thompson Report") to Mot. to Exclude [Doc. # 207-3].)

[2] Dr. Thompson's opinion regarding the scientific credibility of Dr. Huang's medical opinions is no longer relevant as Dr. Huang's testimony has been precluded.

Manville MSDSs. (Mem. Supp. Mot. to Exclude [Doc. # 207-1] at 4.) Plaintiffs also seek to preclude

his testimony on whether or not the Beyers were aware of risks posed by SPF and proper safety

precautions on the basis of Dr. Thompson's analysis of advertisements for the TigerFoam that Mr.

Beyer installed in his home prior to Anchor's installation of the Icynene and Johns Manville foam.

At deposition, Dr. Thompson admitted that he did not have access to TigerFoam advertisements

and safety sheets from the appropriate time period. When he reviewed materials from the

appropriate time period, he admitted that "it's possible" Mr. Beyer would not have the same level

of knowledge about safety as Dr. Thompson imputed to him.

Dr. Thompson relied on publications by the CDC and EPA in forming his opinions about

what symptoms are commonly associated with exposure to isocyanates and polyols. (*See*

Thompson Report at 8.) Similarly, he relies on peer-reviewed journal articles to explain how long

these chemical remain in the air after spraying and how this changes the risk of experiencing

symptoms. (*Id.* at 9.) Dr. Thompson draws on this body of knowledge to evaluate Mr. Beyer's

allegation that he was present during the spraying of the SPF but did not wear protective gear. Dr.

Thompson concludes that if this allegation were true, Mr. Beyer would have suffered an immediate

asthma attack. Dr. Thompson's testimony regarding known, common symptoms associated with

exposure to SPF is adequately grounded in the appropriate literature and relevant to assessing the

likelihood that Plaintiffs' home is suffused with noxious substances. Therefore, Dr. Thompson's

testimony on opinions (1), (2), and (3) will be permitted.  Similarly, his critiques of Dr. Nicewicz

and Mr. Cude are relevant, are supported by reliable methodology and data, and may be presented

at trial. Dr. Thompson's testimony regarding the general chemistry of SPF and its constituents, as

well as how SPF is sprayed and how it adheres to surfaces, is not challenged by Plaintiffs in their

Daubert motion.

However, Dr. Thompson's opinion that the facts do not support Plaintiffs' claims of physical injury is irrelevant and will be excluded. Additionally, since Dr. Thompson's deposition testimony revealed that his opinion about the Beyers' knowledge concerning safety precautions was based on flawed Tiger Foam materials, it will be precluded as unreliable.

### 2. Mason Knowles

Mason Knowles is the president of Mason Knowles Consulting, LLC, which specializes in providing technical information, training and inspections for the SPF industry. (Ex. 3 ("Knowles Report") to Mot. to Preclude Testimony [Doc. # 207-4] at 1.) Mr. Knowles has acquired his expertise through 46 years of experience in the spray polyurethane foam field and through certifications he has earned, including the Certified Field Examiner certificate from the Spray Polyurethane Foam Alliance. (*Id.*) Plaintiffs do not challenge his expertise.

Mr. Knowles was engaged to perform an on-site inspection for the purposes of identifying any defects in the SPF, determining if the SPF was properly installed, and determining if the various brands of SPF could contribute to any odors reported by Mr. Beyer. (Knowles Report at 3; Ex. 6 ("Knowles Tr.") to Mot. to Preclude Testimony [Doc. # 207-7] at 6:9-12) (Mr. Knowles was engaged to "do an inspection on the Beyer case and to . . . evaluate the foam, analyze it and see if it was installed according to the best industry practices.")

During the inspection of the house, Mr. Knowles determined that the foam insulation product remaining in the house on the ground and second floors was the Tiger Foam that Mr. Beyer had installed himself between 2006 and 2008:

> [S]mall particles of SPF were observed to the underside of the roof deck and to the other 2 exterior walls indicating that foam had been installed to those areas earlier and were removed at a later date. . . . [T]his is where the Johns Manville foam was installed. . . . The foam that remained on the left side wall was originally covered

6

> with plaster. . . . According to Mr. Beyer's deposition testimony, he installed Tiger
> Foam between plaster and exterior sheathing . . . . The surface profile and cell
> structure of the foam is consistent with a DYI . . . Tiger Foam application.

(Knowles Report at 6.)

Mr. Knowles was permitted to take a sample of the Tiger Foam for analysis, and his report reflects certain problems with the manner in which the Tiger Foam was installed. The cellar was the only place in the house where Mr. Knowles found foam insulation manufactured by Johns Manville or Icynene and installed by Anchor, but he was only permitted to make a visual inspection of that foam; he was not allowed to take a sample of the remaining foam so as not to risk dislodging suspected lead paint. (Knowles Tr. at 47:17-20 ("if I could have taken samples from the basement, I could have made judgment on the quality of the foam as installed in the basement.")) Thus, Mr. Knowles' opinions with respect to the SPF at issue in this case are very narrow: "Because the Johns Manville foam had previously been removed I cannot provide an opinion on the quality of the application. And because I was not allowed to obtain samples of the SPF in the basement I am not able to provide an opinion on the quality of the Icynene foam either." (Knowles Report at 16.)

Plaintiffs argue that Mr. Knowles' testimony regarding the SPF should be precluded because he "did not conduct any chemical analysis or off-gassing emissions tests of the defective SPF that was removed from Plaintiffs home" and because he overlooks the possibility that either the JM or Icynene SPF could be causing lingering odors. These arguments are misplaced, as Mr. Knowles explains in his report that the SPF in the attic and master bedroom "is not presently emitting objectionable odors" and because he explains why he did not conduct any chemical analysis or emissions test of the Icynene products still installed in the cellar or the SPF foam removed from Plaintiffs' house and stored in several garbage bags. (Knowles Tr., Ex. 6 to Mot. to Preclude Testimony [Doc. # 207-7] at 46:25-47:24 (Regarding the garbage bags of foam removed

from the house, Mr. Knowles testified that ". . . chunks of foam usually . . . are not in a way that you can really analyze them properly.)) More importantly, with respect to Plaintiffs' assertion that Mr. Knowles admittedly "did not perform any of the [steps for properly analyzing SPF installation] on either the Icynene or JM SPF SPF that remained in Plaintiffs' home," Plaintiffs neglect to quote Mr. Knowles' explanation for this omission:

> Q: So you didn't even do an analysis at all of the remaining Corbond material, the remaining Icynene material? . . .
> A: I didn't see any that I could take samples of because I wasn't allowed to.

(Knowles Tr. 35:3-10.) Although Mr. Knowles' testimony on the Defendant's installation of SPF will necessarily be limited, his opinion that no Anchor-installed foam remained in the upper floors where it was removed and no offensive odors were detected there, and the results of his visual inspection of the foam in the basement could assist a jury in determining the nature and scope of property damage or impact on property value. For this reason, this testimony will be permitted.

Plaintiffs further argue that Mr. Knowles' testimony concerning whether or not Anchor was trained in the best industry practices should be precluded because Mr. Knowles' opinion discounted deposition testimony from Anchor's installers, Beau Sarette and Raymond LaPierre, about how they installed SPF. (Mem. Supp. Mot. to Preclude at 14.) Defendants do not respond directly to this argument except to note that it is not an attack on Mr. Knowles' methodology, but rather on the conclusions he reached. Because Mr. Knowles is well-credentialed to opine on the proper training that Anchor employees should have received, and because he can rely on the deposition testimony of Anchor's installers, as well as other evidence in the case such as certificates received, he may offer his opinions about appropriate training and whether it was provided to Anchor employees.

Finally, Plaintiffs argue that Mr. Knowles' report is unreliable because it identifies the wrong Icynene product: MR-R-200, while the record demonstrates that Anchor actually installed MR-R-210 which was still an experimental product at the time it was installed. (Mem. Supp. Motion to Preclude at 15-16.) Defendant argues that this is mere "nitpicking." (Opp'n. [Doc. # 213] at 10.)   Since Plaintiffs do not explain how this misidentification (if it is in fact misidentification) affected Mr. Knowles' conclusions about the foam, their motion to preclude his testimony on this ground is denied.

### 3.  James Poole Ph.D.

James Poole is a board-certified industrial hygienist with an M.A. and Ph.D. in public health, industrial hygiene and safety management from the University of South Florida. He is a former OSHA health compliance officer. Plaintiffs do not challenge his expertise.

Dr. Poole is expected to opine that (1) his analysis of air samples taken at the Beyer home did not detect any compounds that suggest the spray foam installed by Anchor is off-gassing and there are no conditions in the Beyer home related to Anchor-installed SPF that would preclude occupancy; (2) prior to inspection, the house was emptied of customary household cleaning supplies, whose presence would have affected the concentration of VOCs in the air; (3) the air sampling performed by Plaintiffs' experts Gary Cude and Bernard Bloom is unreliable because of lack of chain of custody forms, no calibration records, no compound-specific standards used and non-quantitative results; (4) Mr. Cude's assertion that the acetic acid found by Mr. Bloom in earlier testing is associated with spray foam is not reliable because acetic acid is associated with many wood-based household items and the acid found in the Beyer home was well-below exposure limits set by the U.S. Consumer Product Safety Commission. (Ex. 4 ("Poole Report") to Mot. to Preclude [Doc. # 207-5] at 9.)

Plaintiffs do not challenge Dr. Poole's methodology for testing air samples, but rather assert that Dr. Poole relied on insufficient data and failed to take possible alternative explanations into account in reaching his conclusions. Specifically, Plaintiffs argue that Dr. Poole's failure to test the foam to see if it was off-gassing vitiates his conclusions about what VOCs are present in the air in Plaintiffs home. (Mem. Supp. Mot. to Preclude at 18.) They further maintain that, while he tested the air samples for the chemicals listed on the MSDSs, his failure to test the foam in the home meant that he potentially overlooked "new by-products" produced during the chemical reactions that occur while the foam cures. (*Id.* at 17.)

Defendant notes that Plaintiffs do not point out any flaw in Dr. Poole's methodology and do not identify any specific chemical or VOC that Dr. Poole should have but did not test for. (Opp'n at 16.) Defendant further notes that Plaintiffs cite no legal authority, expert testimony or any other authority that would undermine Dr. Poole's reliance on air testing—rather than foam testing—as a means of determining whether there are VOCs in the air in the Beyer home. Since "the district court must focus on the principles and methodology employed by the expert" and since Plaintiffs do not challenge Dr. Poole's air testing methodology, but only urge that he should have tested the foam as well, Plaintiffs' challenges go to the weight, rather than the admissibility of Dr. Poole's testimony regarding the results of his air sampling. *Amorgianos*, 303 F.3d at 266.

Plaintiffs also challenge Dr. Poole's observations during the home inspection that the house was not replete with cleaning and other materials typically found in residences and appeared to have been emptied of "all cleaning supplies, dishwashing detergent, clothes washing detergent, soap or body wash in the showers, shampoo or conditioner, toilet cleaning supplies, candles, etc." (Poole Report at 9-10.) Plaintiffs do not represent that the house was not emptied of these items. Rather, they challenge the evidentiary record Dr. Poole created (e.g. "Dr. Poole fails to inform the

reader that he arbitrarily selected which cabinets to photograph, despite his testimony that he looked under all of the cabinets in all of the rooms." (*Id.*)) However, Dr. Poole's deposition clarifies that he offers this testimony on the basis of his personal observation and that he relies on his long career to draw comparisons:

> Q: Do you have any reason to dispute that . . . they might have kept their cleaning supplies somewhere other than right there under the sink?
> A: Well, we looked under all the cabinets in all the rooms, and there was nothing there the date of our inspection. In fact, they even removed the trash can [indicating a trash can visible in a photographic exhibit shown to the deponent during deposition.] . . . That trash can was not there on the date I was there, and when I looked under all the cabinets. . . . I think there's a difference between clean and removing all the chemical compounds from the house. . . . It hasn't happened in my career of sampling in 23 years, 25 years now.

(Ex. 15 ("Poole Tr.") to Mot. to Preclude [Doc. # 207-16] at 28:12-29:19.) Plaintiffs' critique provides no basis for precluding Dr. Poole's testimony on Dr. Poole may testify to his observations during the home inspection and how the presence or absence of such items would affect air sample analysis.

Finally, Plaintiffs object that "Dr. Poole's testimony will be prejudicial" because he did not produce all of the raw data supporting the lab tests on which he relied. (Mem. Supp. Mot to Preclude at 20.) Although Fed. R. Civ. P. 26(a)(2)(B)(ii) requires that an expert report contain "the facts or data considered by the witness," Dr. Poole testified at his deposition that he did not rely on the raw data, but rather on the air sample analysis produced by the three separate labs to whom he sent the samples: "that's true, I didn't look at our raw data. That's done by the laboratories, the accredited laboratories we chose." (Poole Tr. at 45:9-11.) Further, Dr. Poole testified that the raw data is not "typically part of a file [sent out by an accredited lab along with its report]. You can

request it, and they will certainly provide it. I've gone ahead and made the request on your behalf." (Poole Tr. at 44:20-23.)

Defendant argues that any delay in producing raw data that contributed to the conclusions reached by Dr. Poole should have been the subject of a Fed. R. Civ. P. 37 motion to compel and a request to depose Dr. Poole on these results. The docket does not reflect any attempt by Plaintiffs to do so. Further, Plaintiffs motion does not indicate any methodological flaw or infirmity in the conclusions Dr. Poole reached that became apparent because of the absence of the raw data, which Plaintiffs received after the deposition. Indeed, Plaintiffs do not discuss the raw data substantively, but base their argument solely on the timing of its production. They give no explanation of how they were prejudiced or why they did not seek a second deposition regarding this data to cure any alleged prejudice.

Plaintiffs' arguments regarding Dr. Poole's air sampling results and his conclusions about air quality in the Beyer home, which identify a form of testing that Dr. Poole did not perform, go to the weight of Dr. Poole's testimony, not its admissibility. Plaintiffs' arguments regarding items he did and did not observe in the house may be relevant to his credibility and rigor and can be explored on cross examination. Absent any specifically identified prejudice suffered by Plaintiffs, their motion to preclude Dr. Poole's expert testimony will be denied.

### III. Conclusion

For the foregoing reasons, Plaintiffs' Motion to Preclude Testimony is GRANTED in part and DENIED in part: Dr. Thompson is precluded from offering opinions about medical causation of Plaintiffs' symptoms or Dr. Huang's report, although he may testify about commonly recognized symptoms associated with SPF installation and the chemistry and process of SPF installation; Mr.

Knowles may testify as to all the subjects identified in his report; and Dr. Poole may testify to all the subjects identified in his report.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 28th day of February 2017.